Filed: July 14, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 97-1936
(CA-97-364)

Board of Education of Montgomery County,

Plaintiff - Appellee,

versus

Brett Y, etc.,

Defendant - Appellant.

O R D E R

The court amends its opinion filed June 26, 1998, as follows:

On page 3, footnote 2, line 2 -- "Pub.L. No." is corrected to read "Pub. L. No."

On page 8, footnote 9, line 2 -- the word "servies" is corrected to read "services."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BOARD OF EDUCATION OF
MONTGOMERY COUNTY,
<u>Plaintiff-Appellee,</u>

v.

BRETT Y, a minor, by his parents
and next friends, Mark and
Wendy Y,
<u>Defendant-Appellant.</u>

No. 97-1936

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-97-364)

Argued: January 27, 1998

Decided: June 26, 1998

Before HAMILTON and WILLIAMS, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished opinion. Judge Williams wrote the majority
opinion, in which Senior Judge Phillips joined. Judge Hamilton wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Michael Jeffrey Eig, BOGIN & EIG, Washington, D.C.,
for Appellant. Janet E. Pitterle Holt, HOGAN & HARTSON, Wash-

ington, D.C., for Appellee. **ON BRIEF:** Matthew B. Bogin, Helen Goff Foster, BOGIN & EIG, Washington, D.C., for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

WILLIAMS, Circuit Judge:

Brett Yader,**1** a minor, by his parents and next friends Mark and Wendy Yader, appeals from the district court's decision denying the Yaders' reimbursement for the costs of unilaterally placing Brett at the Grove School (Grove), a private institution in Madison, Connecticut. A state administrative law judge (ALJ) concluded that Brett Yader was denied a free appropriate public education pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. § 1400 et seq. (West 1990 & Supp. 1997), and granted the Yaders' request for reimbursement of the cost of Brett's residential placement at Grove for the 1996-1997 school year. The Board of Education of Montgomery County (the Board), filed suit against the Yaders in the United States District Court for the District of Maryland challenging the ALJ's decision, and the district court reversed.

We agree with the district court that the Montgomery County Public School System (the school system) adequately complied with the procedural requirements of the IDEA and that it provided Brett Yader with an appropriate placement pursuant to the IDEA. We also conclude that the district court did not err in applying this Circuit's standard of review of state administrative decisions under the IDEA. Thus, we affirm the district court's decision.

_____

**1** The caption for the case in federal district court was originally styled Board of Educ. of Montgomery County v. Brett Y., to protect the identity of the minor. The parties stated at oral argument, however, that they had no objection to the use of Brett's full name.

2

I.

The IDEA is a complex statute designed to provide free appropriate educational services to the more than eight million children with disabilities in the United States. See 20 U.S.C.A. § 1400 (West Supp. 1997). The IDEA amended the Education of the Handicapped Act, 20 U.S.C.A. § 1401 et seq. (West 1990), which provided federal funds to state and local agencies to assist in the education of handicapped children, conditioning such funding upon the states' compliance with mandated goals and procedures.**2**

The IDEA, like its predecessor, requires that all children with disabilities be provided with a "free appropriate public education" (FAPE). 20 U.S.C.A. § 1400(c) (West Supp. 1997). FAPE is defined as special education and related services that: (1) are provided under public supervision and at public expense without cost to parents; (2) meet the standards of the state educational agency; (3) include an appropriate preschool, elementary, or secondary school education; and (4) are provided in conformity with the individualized education program required by § 1414(a)(5) of the Act. See 20 U.S.C.A. § 1401(a)(18) (West 1990).

To receive funds from a state educational agency, local educational agencies and intermediate educational units must provide assurance that they will develop an "individualized education program" (IEP) for each child with a disability at the beginning of each school year and will review and, if appropriate, revise, the IEP's provisions periodically, but not less than annually. See 20 U.S.C.A. §§ 1401(a)(20), 1414(a)(5) (West Supp. 1997). The IEP is a written statement developed through a meeting of a representative of the local educational agency, the child's teacher, the child's parent or guardian, and, when appropriate, the child. See 20 U.S.C.A.§ 1401(a)(20) (West Supp.

_____

**2** The 1990 amendments substituted"Individuals with Disabilities Education Act" for "Education of the Handicapped Act." See Pub. L. No. 101-476, § 901(a)(1), 104 Stat. 1103, 1141-42 (1990), codified at 20 U.S.C.A. § 1400(a) (West Supp. 1997). For ease of reference, we refer only to the IDEA, even when discussing cases interpreting the Act prior to the 1990 amendments. See Gadsby v. Grasmick , 109 F.3d 940, 942 n.1 (4th Cir. 1997).

1997). The IEP must include: (1) a statement of the child's present levels of educational performance; (2) a statement of annual goals, including short-term objectives; (3) a statement of the specific educational services to be provided to the child and the extent to which the child will participate in regular educational programs; (4) a statement of the needed transition services for students beginning no later than age 16 and annually thereafter; (5) the date for the initiation and duration of the educational services; and (6) objective criteria and evaluation procedures and schedules for determining, at least annually, whether the instructional objectives are being achieved. See id.

The IDEA also requires that prior written notice be given to the parents of a child whenever a local education agency or intermediate educational unit proposes to initiate or change the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child. See 20 U.S.C.A. § 1415(b)(1)(C) (West 1990). If a complaint is made regarding any of these matters, the parents must be provided an impartial due process hearing conducted by the state educational agency, local educational agency, or intermediate educational unit, as determined by state law. See 20 U.S.C.A. § 1415(b)(2) (West 1990).**3**

Maryland law requires that a parent's request for a due process hearing be made through the Office of Administrative Hearings. See Md. Code Ann., Educ. § 8-413(c) (Michie 1997). The Office of Administrative Hearings will then appoint an impartial ALJ to review the child's education placement. See id. Within 180 days of the hearing decision, any party may appeal to the United States District Court for the District of Maryland or to the circuit court for the county in which the student resides. See id. at § 8-413(h).

---

**3** The federal regulations implementing the IDEA similarly provide that a parent or a public educational agency may initiate an impartial due process hearing on any matters relating to the initiation or change in the identification, evaluation, or educational placement of a child, or the provision of a FAPE to a child, or the refusal to initiate or change the identification, evaluation, or educational placement of a child, or the provision of a FAPE to a child. See 34 C.F.R. §§ 300.504(a)(1) & (2), 300.506 (1997).

4

The IDEA requires that state educational agencies establish and maintain procedures to ensure that children with disabilities and their parents are guaranteed procedural safeguards in the state agencies' provision of a FAPE. See 20 U.S.C.A. § 1415 (West Supp. 1997). In keeping with this requirement, Maryland has promulgated regulations implementing its Education Article, Title 8, Subtitles 3 and 4, which guarantee a FAPE for all students with disabilities. See Md. Regs. Code tit. 13A, § 05.01 (1989).

Maryland's implementing regulations require that an IEP must be approved by an Admission, Review, and Dismissal Committee (ARD Committee). See Md. Regs. Code tit. 13A, § 05.01.08 (1991). The ARD Committee is to be composed of a chairman designated by the local superintendent, individuals who are familiar with the student's functioning (including a special educator and interdisciplinary personnel from the public agency and the local health department), and other appropriate persons, such as those expected to become deliverers of direct service to the student. See Md. Regs. Code tit. 13A, § 05.01.08(A) (1991). An ARD Committee meeting must be open to the child's parents, who shall be notified of the meeting at least 10 days in advance. See Md. Code Ann., Educ. § 8-405 (Michie 1997).

II.

Brett Yader is a severely emotionally disturbed high school student. He has been diagnosed with oppositional defiant disorder, anxiety disorder, and attention deficit hyperactivity disorder (ADHD). Although Brett has experienced emotional problems for which he has received therapy intermittently since the age of five, none of his emotional problems affected his education until he reached the eighth grade.

Brett attended the Montgomery County Public Schools in Montgomery County, Maryland, during the 1994-95 and 1995-96 school years. In May of 1995, while attending Takoma Park Middle School, Brett was diagnosed with ADHD. In response, the school prepared an accommodation plan for Brett.

In the fall of 1995, Brett began ninth grade at Richard Montgomery High School. In October, Brett's accommodation plan was routinely

reviewed, and he was performing well academically. Brett's attendance during the fall of 1995 declined, however. As a result, the school system began a screening process on December 6, 1995, which eventually led to an evaluation by the ARD Committee.

On January 17, 1996, the ARD Committee met to evaluate Brett. The Committee determined that Brett was disabled and eligible for special education services. The Yaders attended this meeting. The ARD Committee developed an IEP for the remainder of the 1995-96 school year. At the request of the Yaders, the IEP stated that Brett was "other health impaired" rather than "seriously emotionally disturbed."[4] (J.A. at 178.) The ARD Committee determined that Brett would receive Intensity II[5] special education services during the remainder of the 1995-96 school year at the Richard Montgomery High School.

_____

[4] The federal regulations implementing the IDEA state that "other health impairment" means "having limited strength, vitality or alertness, due to chronic or acute health problems such as a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, or diabetes that adversely affects a child's educational performance." 34 C.F.R. § 300.7(b)(8) (1997).

According to the regulations, "serious emotional disturbance" is defined as:

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance-- (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors; (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (C) Inappropriate types of behavior or feelings under normal circumstances; (D) A general pervasive mood of unhappiness or depression; or (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.7(b)(9) (1997).

[5] The Maryland regulations provide in part that Intensity II services "may be considered appropriate for the student who may be appropriately served by receiving service through the special education program, not to exceed an average of 1 hour per school day." Md. Regs. Code tit. 13A, § 05.01.10(E)(3) (1991).

6

The IEP was reviewed after sixty days. The March 6, 1996, review indicated that Brett's attendance at school had "greatly improved," and that he was performing well academically. Comments made by Brett's family, however, indicated that Brett "was going into crisis at home," (J.A. at 174), and that he possibly needed hospitalization. (J.A. at 175.) Although he was attending school regularly, Brett's behavior at home was characterized by his parents as "angry, bordering on violen[t]." (J.A. at 290.)

On April 17, 1996, an ARD Committee meeting was held to conduct a review of Brett's IEP. The ARD Committee concluded that Brett's academic performance had continued to improve in Intensity II placement. Brett attended Richard Montgomery High School for the remainder of the 1995-96 school year. Brett's school attendance rapidly declined, however, near the end of the school year. On or about June 10, 1996, Brett stopped attending school altogether. He slept all day, stayed up all night, and refused to leave his home or his bed. In response to this crisis, Brett's parents had him evaluated at the Sheppard Pratt Psychiatric Hospital, but had to request police intervention to get Brett to attend the evaluation. Although after his evaluation Brett was admitted to the American Day Treatment Center in Chevy Chase, Maryland, for the most part he refused to attend the program.

On June 19, 1996, another ARD Committee meeting was convened. The IEP developed at this ARD meeting stated for the first time that Brett was "seriously emotionally disturbed." (J.A. at 177.) The ARD Committee determined that Brett's needs could not be met in a general education program and recommended a therapeutic day school.

Brett's folder was forwarded to the Montgomery County Public Schools' central office for consideration of whether his special education services should be increased to Intensity V or VI,**6** and, if so, for

_____

**6** The Maryland regulations define Intensity V services in part as "appropriate for the student who requires a more intensive special education program than Intensities I-IV." Md. Regs. Code tit. 13A, § 05.01.10(E)(6) (1991). The regulations define Intensity VI services in

7

a determination of an appropriate placement for Brett.**7** David Cross, a placement specialist with the Montgomery County Public Schools, received Brett's file on approximately July 12, 1996.**8** Mr. Cross testified that he reviewed Brett's file the next day and determined that it needed to be supplemented with an updated psychological evaluation. He requested an evaluation from the school psychologist, Dr. Rene Johnson. Dr. Johnson made two attempts to obtain a psychological evaluation of Brett but was unable to do so because Brett would not cooperate. Mr. Cross then requested that a psychologist from the school system's "Rapid Response Team" attempt to perform a psychological evaluation. That psychologist was also unsuccessful in obtaining an updated evaluation of Brett because Brett would not leave the house. After these unsuccessful attempts to obtain a further psychological evaluation of Brett, Mr. Cross scheduled a CARD Committee meeting**9** for August 26, 1996.

_____

part as "appropriate for the student who requires special education programming and related services in a residential setting. This includes 24-hour special education and related services if determined by the Admission, Review, and Dismissal Committee to be necessary to implement the student's individualized education program." Md. Regs. Code tit. 13A, § 05.01.10(E)(7) (1991).

**7** In the Montgomery County Public School System, if a student's special education needs cannot be met within his current school setting, the child's file is referred to the central office for consideration whether the child needs Intensity V or VI services. The file must be reviewed by a placement specialist to determine whether it requires any additional information. Next, a Central Admission, Review, and Dismissal (CARD) Committee meeting must be scheduled for an evaluation of the student and recommendation for appropriate services. As with an ARD Committee meeting, the CARD Committee meeting must be open to the child's parents, who shall be notified of the meeting at least 10 days in advance.

**8** The ALJ found that "[t]here is no dispute that the file was sent to the central offices on or before June 30, 1996 although no one was able to document the exact date." (J.A. at 315.) There is no explanation why Mr. Cross, the placement specialist, did not receive the file until approximately July 12.

**9** In the Montgomery County Public School System, if a student requires Intensity V or VI services and his needs cannot be met within his current school setting, a Central Admission, Review, and Dismissal (CARD) Committee meeting must be scheduled to evaluate the student and recommend appropriate services. See discussion ante, n.7.

8

Meanwhile, Mrs. Yader visited the educational and treatment facilities at both the Regional Institute for Children and Adolescents (RICA) and Grove during the summer of 1996. On July 15, 1996, the Yaders, through counsel, requested a due process hearing to review the school system's identification, evaluation, or placement for special education services for Brett. Although Brett was accepted at Grove on or about July 17, 1996, the Yaders did not withdraw their due process hearing request.

Due to other student meetings, both counsel for the Yaders and Mr. Cross were unavailable on August 26, 1996, so the CARD Committee meeting was convened instead on August 30, 1996. At that meeting, Brett's IEP was modified to recommend that Brett be offered Intensity V services with a possible residential placement to address his non-educational needs. Brett was given an interim placement at Richard Montgomery High School with Intensity III services.[10] The CARD Committee referred Brett for an interview at RICA in Rockville, Maryland, and told the Yaders that a place was being held for Brett at RICA for the 1996-97 school year.[11] The Yaders' counsel made clear that Brett would not attend RICA even if he were accepted after the interview because the Yaders had already made plans for Brett to attend Grove. Nevertheless, Brett interviewed at RICA on September 4, 1996, and was accepted into the residential program.

The Montgomery County Public School System's school year began on September 3, 1996. Counsel for the Yaders was notified of Brett's acceptance at RICA in writing by a letter dated September 10, 1996. The Yaders were notified in writing by a letter dated September 12, 1996, that Brett had been accepted at RICA for Intensity V special

_____

[10] The Maryland regulations provide that Intensity III services "may be considered appropriate for the student who may be appropriately served by receiving special educational services not to exceed an average of 3 hours per school day." Md. Regs. Code tit. 13A,§ 05.01.10(E)(4) (1991).

[11] RICA is jointly funded and operated by the State of Maryland's Department of Health and Mental Hygiene and the Montgomery County Public Schools. The Montgomery County Public School System, however, cannot make a placement at RICA, but can only refer a child to RICA for an interview. RICA then determines whether the child is an appropriate candidate and should be admitted to its program.

9

education and enrollment in the residential program to address Brett's non-educational needs. As stated earlier, however, Brett previously had been enrolled at Grove and attended Grove for the entire duration of the 1996-97 school year.

Because the Yaders had requested a due process hearing on July 15, 1996, the ALJ held hearings on October 1, 1996, and November 1, 1996, to review Brett's placement. The ALJ issued a decision on December 16, 1996, finding that the school system had committed serious procedural violations of the IDEA, denying Brett a FAPE. The Board appealed the ALJ's decision, and, after a bench trial, the district court reversed. The Yaders now appeal, arguing that the district court failed to apply the proper standard of review, that the school system did not comply with the procedural requirements of the IDEA in the development of Brett's IEP, and that the school system's ultimate placement did not meet Brett's special education needs.

III.

To determine whether the Yaders are entitled to reimbursement for placing Brett at Grove during the 1996-97 school year, we must determine whether the August 30, 1996, IEP proposed by the CARD Committee was appropriate. In determining whether an IEP is appropriate and whether the school system has fulfilled its obligations to provide a student with a FAPE, the proper inquiry is twofold. See Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982). We must decide: (1) whether the State has complied with the IDEA's procedural requirements in developing and implementing the IEP and (2) whether the IEP is "reasonably calculated" to enable the child to receive educational benefits. See id. at 206-07. The failure to meet the procedural requirements of the Act itself is an "adequate groun[d] . . . for holding that a school failed to provide . . . a FAPE." Hall v. Vance County Bd. of Educ., 774 F.2d 629, 635 (4th Cir. 1985).

Courts reviewing state administrative decisions in IDEA cases must make "independent decision[s] based on a preponderance of the evidence." Rowley, 458 U.S. at 205 (internal quotation omitted) (alteration in original). It is implicit in the IDEA, however, that the reviewing court should give due weight to administrative findings. See id. at 206. This Circuit further refined the standard of review in Doyle v.

10

Arlington County Sch. Bd., 953 F.2d 100 (4th Cir. 1992), holding that findings of fact by administrative law judges and hearing officers in IDEA cases "are entitled to be considered prima facie correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." Id. at 105. Furthermore, we noted that "when fact-findings are regularly made and entitled to prima facie correctness, the district court, if it is not going to follow them, is required to explain why it does not." Id.

In reviewing the findings of the ALJ and the district court with regard to Brett's need for a residential placement, we are bound by the same standard of review set forth by the Supreme Court in Rowley and later refined by this Circuit in Doyle. We must "make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." Id. at 103 (citing Rowley, 458 U.S. at 206).

The Yaders argue that the district court failed to give due deference to the ALJ's findings of fact, as required by this Court's mandate in Doyle, resulting in reversible error. We disagree. We conclude that, while the district court did reject several of the ALJ's findings of fact, the district court adhered to the appropriate standard of review by providing well reasoned explanations for rejecting the ALJ's findings.[12]

A. Procedural Requirements

The ALJ determined that the school system committed two serious procedural violations that caused Brett to lose educational opportunity. First, the ALJ concluded that the school system's extensive delay in convening the CARD Committee meeting and its resulting

---

[12] The district court never specifically cited Doyle. The district court did, however, cite a district court case which articulated the Doyle standard. See Board of Educ. of Montgomery County v. Brett Y., No. 97-364, at 8-9 (D. Md. July 9, 1997) (citing Sanger v. Montgomery County Bd. of Educ., 916 F. Supp. 518, 521 (D. Md. 1996)). While it would have been preferable for the district court to rely on this Court's precedent, the district court did not apply the incorrect standard of review merely because it relied upon a district court case stating the same legal standard.

11

failure to develop and implement the IEP in a timely fashion caused Brett to lose educational opportunity. Second, the ALJ concluded that deficiencies in the IEP caused Brett to lose educational opportunity.**13** In considering whether the district court was correct in rejecting the ALJ's findings, we keep in mind that the deferential standard announced in Doyle also extends to the ALJ's findings regarding the Board's compliance vel non with the procedural requirements of the IDEA. See Doyle, 953 F.2d at 106 n.6. We agree with the district court that any delay by the school system in convening a CARD Committee meeting and any deficiencies in the IEP did not deny Brett educational opportunity.

1.

First, the ALJ found that the delay in convening the CARD Committee meeting -- from June 19, 1996 to August 30, 1996 -- caused Brett to lose educational opportunity. The ALJ also found that "there was no IEP in effect at the start of the school year." (J.A. at 315.)

The ALJ stated, "[w]hat is most troubling about the procedural history in this case is the extended delay between the June 19, 1996 ARD meeting and the CARD meeting held on August 30, 1996." (J.A. at 315.) The district court agreed that "it would have been preferable for [the school system] to act more expeditiously to finalize Brett's IEP and make a placement decision." (J.A. at 463.) The district court concluded, however, that the timing of events was not so egregious as to constitute a violation by the school system of Brett's procedural rights provided under the IDEA.

In keeping with the deferential standard of review announced in Doyle, the district court gave reasons for rejecting the ALJ's finding. The district court noted that after the June 19, 1996, ARD meeting, Brett's file was sent to the central placement office, where it arrived on approximately July 12, 1996. Mr. Cross testified at the bench trial

_____

**13** While the ALJ characterized these deficiencies as procedural, the district court characterized them as substantive. Whether the alleged deficiencies in the IEP are characterized as procedural or substantive, however, does not change our conclusion that Brett was not denied a FAPE.

that it normally took a month to schedule a CARD Committee meeting from the time the central placement office received the file, but, in this case, the first open date was approximately six weeks from the date Brett's file was received, on August 26, 1996.**14**

The ALJ stated, "I see nothing in either the federal or State regulations that entitles a public agency to do nothing because it's summer

_____

**14** There is some confusion in the record and in the district court's opinion about the school system's usual length of time for scheduling a CARD Committee meeting. We must only determine, however, whether the district court properly held that the school system complied with the requirements of the IDEA. The IDEA requires that the IEP must be established or revised "at the beginning of each school year and [then reviewed] and, if appropriate, [revised], .. . periodically, but not less than annually." 20 U.S.C.A. § 1414(a)(5) (West Supp. 1997); see also Gadsby v. Grasmick, 109 F.3d 940, 950 (4th Cir. 1997) (noting that failure to develop an IEP prior to the beginning of the school year violates IDEA); Combs v. Rockingham County Sch. Bd., 15 F.3d 357, 358 (4th Cir. 1994) (noting IDEA requires that schools establish IEP, review it annually, and revise it when appropriate). Furthermore, in conjunction with the federal regulations, the Secretary of Education noted that "the timing of meetings to develop, review, and revise IEPs is left to the discretion of each agency" and "[m]eetings may be held any time throughout the year, as long as IEPs are in effect at the beginning of each school year." 34 C.F.R. § 300.343 note (1997). Brett's IEP, which was originally established on January 17, 1996, was reviewed after sixty days on March 6, 1996; reviewed again on April 17, 1996; reviewed and revised on June 19, 1996, after Brett's behavior and performance had declined; and reviewed again on August 30, 1996, at the CARD Committee meeting. Thus, Brett's IEP was reviewed four times within the year it was initially developed and prior to the beginning of the school year. We conclude this was sufficient to meet the requirements of the IDEA.

We note that the Yaders requested at the June 19, 1996, ARD Committee meeting that a CARD Committee meeting be convened as quickly as possible. We acknowledge that the IDEA emphasizes parental involvement and that the school system could have acted more quickly to honor the Yaders' request to have Brett's case expedited. Although the school system's handling of Brett's case was not a model of efficiency, the school system has to deal with many cases. In short, although the school system could have acted more quickly, it did not violate the statute's requirements.

time." (J.A. at 318.). Contrary to the ALJ's assertion, the district court correctly noted that the Secretary of Education's interpretive guidelines do recognize that time constraints may be relaxed during the summer or a vacation period. The interpretive guidelines provide that an IEP must be implemented as soon as possible, except when the meetings occur during the summer or a vacation period. See 34 C.F.R. § 300.342(b) note (1997).**15** Furthermore, as the district court found, the school system was not "doing nothing." It was attempting to obtain a psychological evaluation and then was moving forward to schedule the CARD Committee meeting. While we agree with the district court that in hindsight it would have been ideal if the school system had treated this case as an emergency and acted immediately, the statute and regulations do not require the school system to act more expeditiously than it did.

The district court also rejected the ALJ's finding that there was no IEP in effect at the start of the school year. In accordance with Doyle, the district court explained its rationale for finding that Brett's IEP

_____

**15** The Secretary of Education has authority to issue rules and regulations to carry out the provisions of the IDEA. See 20 U.S.C.A. § 1417(b) (West 1990).

The Secretary's interpretive guidelines, like the EEOC's guidelines interpreting Title VII and the ADA, are "not controlling upon the courts by reason of their authority." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). When consistent with the statute, they do "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Id. (internal quotation marks and citation omitted); see also Halperin v. Abacus Technology Corp., 128 F.3d 191, 199 n.12 (4th Cir. 1997).

We believe that the interpretive guideline's exception for summer or vacation periods is consistent with the federal regulation's requirement that an IEP be implemented "as soon as possible following the meetings under § 300.343," see 34 C.F.R. § 300.342 (1997), because the school system is likely not to be offering educational services during those periods and, therefore, could not practically implement the IEP. We do not reach the question, however, of whether the interpretive guideline would remain consistent with the regulation in a situation where the school system is offering special education services during a summer school session.

was "in effect" following the August 30, 1996, CARD Committee meeting and that the IEP was timely implemented. While we adopt a slightly different rationale from the district court, we agree that the IEP was developed and implemented at the beginning of the school year in accordance with the requirements of the IDEA.

To determine what the IDEA requires for an IEP to be developed in a timely fashion, we begin by examining the language used in the statute. See Shafer v. Preston Memorial Hosp. Corp., 107 F.3d 274, 277 (4th Cir. 1997). "When Congress does not expressly define a statutory term or phrase, a court should normally construe it in accord with its ordinary or natural meaning." Id. (internal quotation marks omitted). "In most cases, if the statutory language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and . . . the sole function of the courts is to enforce [the statute] according to its terms." Id. (internal quotation marks omitted) (alteration in original).

With these principles of statutory interpretation in mind, we consider the relevant statutory language. The IDEA conditions the receipt of federal funds upon the requirement that local educational agencies and intermediate educational agencies submit an application to the state educational agency. According to the IDEA,"[s]uch application shall . . . provide assurances that the local educational agency or intermediate educational unit will establish or revise, whichever is appropriate, an individualized education program for each child with a disability . . . at the beginning of each school year and will then review and, if appropriate, revise, its provisions periodically, but not less than annually." 20 U.S.C.A. § 1414(a)(5) (West Supp. 1997). The Montgomery County school year began on September 3, 1996. Therefore, according to the plain meaning of the statute, Brett's IEP was timely if "established or revised" prior to September 3, 1996. Because Brett's IEP, which was originally established on January 17, 1996, was revised at the CARD Committee meeting on August 30, 1996, we conclude that it was developed in a timely fashion.

The ALJ concluded that Brett's IEP was not in effect at the start of the school year because Brett had only been provided the opportunity to interview at RICA and had not yet been formally accepted into RICA's residential program. The statute merely requires, however,

15

that an IEP contain "a statement of the specific educational services to be provided to [the] child." 20 U.S.C.A. § 1401(a)(20) (West Supp. 1997). The IEP stated that Brett would receive Intensity V special education services, with an interagency option for residential placement. Thus, it did contain a statement of the services to be provided. Because we conclude that this description of services met Brett's educational needs,[16] we conclude that, contrary to the ALJ's assertion, the IEP was properly in effect. Furthermore, Maryland's regulations allow thirty days for implementation of the IEP.[17] See Md. Regs. Code tit. 13A, § 05.01.09(C) (1991). Thus, the school system had a short period of time to implement the IEP, and RICA did accept Brett into the residential program within thirty days.[18]

In concluding that Brett's IEP was timely, the district court relied upon both the Secretary of Education's federal regulations and interpretive guidelines. The federal regulations provide:

> (a) At the beginning of each school year, each public agency shall have in effect an IEP for every child with a disability who is receiving special education from that agency.
>
> (b) An IEP must--
>
> (1) Be in effect before special education and related services are provided to a child; and

_____

[16] See discussion post , at 20-24.

[17] See discussion post , at 17-19.

[18] As we noted ante, n. 11, RICA is jointly funded and operated by the State of Maryland's Department of Health and Mental Hygiene and the Montgomery County Public Schools. The Montgomery County Public School System cannot make a residential placement at RICA, but can only refer a child to RICA for an interview. RICA then determines whether the child is an appropriate candidate and should be admitted to its program. As counsel for the Board noted during oral argument, the school system ultimately provided Brett with a placement that would allow therapeutic treatment during the day at RICA for Brett's educational needs and a residential placement for Brett's non-educational needs.

16

(2) Be implemented as soon as possible follow-
ing the meetings under § 300.343.

34 C.F.R. § 300.342 (1997) (emphasis added). In addition, the Secre-
tary's interpretive guidelines provide that an IEP is considered "in
effect" when the IEP (1) has been developed properly (at meetings
involving all of the participants specified in the statute); (2) is
regarded by both the parents and agency as appropriate with respect
to the child's needs, goals and objectives, and services to be provided;
and (3) will be implemented as written. See 34 C.F.R. pt. 300 app. C
(question 3) (1997).

The district court, finding that all three requirements in appendix
C, question 3, were met, concluded that the IEP was "in effect" as of
August 30, 1996. First, the district court found that the IEP was devel-
oped properly at a meeting involving all of the participants specified
in the statute, noting that Brett's parents attended the August 30,
1996, CARD Committee meeting. Second, the district court con-
cluded that Brett's parents regarded the IEP as appropriate with
regard to Brett's needs, goals and objectives, and services to be pro-
vided. Finally, the district court concluded that the school system
sought to implement the IEP as written by arranging an interview for
Brett at RICA. As the district court noted, the school system and the
Yaders knew that a place was being held for Brett at RICA. Finding
that all three requirements were met, the district court concluded that
the IEP was "in effect" prior to the beginning of the school year.

We question the district court's conclusion that the Yaders agreed
that the IEP was appropriate. First, the district court erred in finding
that the IEP was signed by Brett's parents.[19] The ALJ correctly found
that neither the Yaders nor the CARD Committee chairman signed the
IEP. Second, the Yaders' disagreement with the IEP and Brett's
placement is the fundamental dispute underlying this action.

_____

[19] While the district court erred in finding that the IEP was signed by
Brett's parents, the fact that the Yaders did not sign the IEP does not nec-
essarily prevent the IEP from being "in effect" pursuant to the interpre-
tive guidelines. The interpretive guidelines themselves state that parents
are not required to sign IEPs. See 34 C.F.R. pt. 300 app. C (question 29)
(1997).

17

We need not dwell on whether the parents signed the IEP, whether they agreed that it was appropriate, or whether the school system complied with the interpretive guideline because we believe that the second element of the interpretive guideline is inconsistent with the statute. The second element of the guideline requires that, to be "in effect," the IEP must be "regarded by both the parents and agency as appropriate with respect to the child's needs, goals and objectives, and services to be provided." See 34 C.F.R. pt. 300 app. C (question 3) (1997). In some cases, the parents, although involved in the process of developing the IEP, will ultimately disagree with the substantive content of the IEP. In such cases, the recourse available to parents is to request a due process hearing, see 20 U.S.C.A. § 1415(b)(2) (West 1990), and, if necessary, to unilaterally withdraw their child and place the child in a different educational setting pending the resolution of their claim, see Burlington School Committee v. Department of Educ., 471 U.S. 359, 369-70 (1985). See also Florence County Sch. Dist. v. Carter, 510 U.S. 7 (1993) (holding parents may be reimbursed for unilateral placement even if private school did not meet requirements of IDEA or state standards). If, as the interpretive guideline suggests, parents could simply refuse to agree with an IEP and thereby prevent the IEP from being properly "in effect," school boards could never fully comply with the IDEA's procedural requirements.[20] We believe this is not the practical effect the statute and regulations were designed to create.[21] We agree with the district court that Brett's IEP was properly in place at the beginning of the school year in compliance with the IDEA. Because the Secretary's interpretive guideline is inconsistent with the statute, however, we rely, as we must, upon the statute's plain meaning. See Kmart Corp. v. Cartier, Inc., 486 U.S.

_____

[20] The district court alludes to this inconsistency between the interpretive guideline and the statute but never fully discusses it. See Board of Educ. of Montgomery County v. Brett Y., No. 97 364, at 12 n.2 (D. Md. July 9, 1997).

[21] We do not mean to imply that school systems can exclude parents from full participation in the development of the IEP. The IDEA requires parental involvement. See 20 U.S.C.A. § 1401(a)(20) (West Supp. 1997). We have also noted that the "spirit and intent" of the IEP development process "emphasizes parental involvement." Spielberg v. Henrico County Pub. Sch., 853 F.2d 256, 259 (4th Cir. 1988) (holding school system erred in making placement determination prior to development of IEP).

18

281, 291 (1988) (noting courts do not defer to agency's interpretation to alter the express intent of Congress).

Because the ALJ found that the IEP was not in effect at the start of the school year, it follows that she could not have concluded that the IEP was timely implemented. The district court disagreed. We also conclude that the district court was correct in its assessment that Brett's IEP was implemented in a timely fashion. The IDEA does not address what is required for the timely implementation of an IEP once it has been developed. It is well-established that when a "statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). The federal regulations provide that an IEP must "[b]e implemented as soon as possible following the meetings under § 300.343." 34 C.F.R. § 300.342 (1997). The interpretive guidelines state that the special education services specified in an IEP must be provided "as soon as possible" following the meeting and that "no delay is permissible." See 34 C.F.R. Pt. 300 app. C (question 4) (1997). The Maryland regulations specifically provide that the IEP "shall be implemented as soon as possible and not more than 30 school calendar days following its development." Md. Regs. Code tit. 13A, § 05.01.09(C) (1991).

We believe that although both phrases are somewhat ambiguous, the interpretive guideline's statement that "no delay is permissible" is plainly inconsistent with the federal regulation's statement that the IEP must be implemented "as soon as possible." Compare 34 C.F.R. Pt. 300 app. C (question 4) (1997) with 34 C.F.R. § 300.342 (1997). We believe, however, that Maryland's thirty-day period is well within the federal regulations' requirement that implementation of the IEP occur "as soon as possible." Cf. Gadsby v. Grasmick, 109 F.3d 940, 954 n.5 (4th Cir. 1997) (noting parents "failed to show that Maryland's interagency review process for out-of-state residential placements under IDEA causes undue delays in the implementation of proposed IEPs"). We, therefore, conclude that the interpretive guideline's provision that "no delay is permissible" in the implementation of the IEP is inconsistent with the federal regulations. Both the Secretary's federal regulation providing that the IEP must be implemented "as soon as possible" and the Maryland regulation's requirement that

19

the IEP must be implemented within thirty days, however, are based upon permissible constructions of the statute.

The IEP was developed on August 30, 1996. The Yaders were informed that Brett was accepted at RICA on September 12, 1996. As the district court noted, "Brett's IEP could have been implemented at RICA by the middle of September, well within the 30 school calendar days that [the school system] had to implement the IEP without committing a procedural violation." (J.A. at 461.) Thus, the district court did not err in rejecting the ALJ's finding of fact that the implementation of the IEP was untimely.

2.

Second, the ALJ concluded that deficiencies in the IEP caused Brett to lose educational opportunity. Specifically, the ALJ found that the school system's failure to include appropriate objective criteria and evaluation procedures for measuring goals, internal inconsistencies in the IEP, and failure to update the IEP to reflect the extent of Brett's disability and most recent educational performance were procedurally deficient under the IDEA.[22] Even assuming that these defi-

---

[22] Although the dissent finds fault with the substantive content of the IEP, it concedes that the school district complied with the procedural requirements of the IDEA. See post at 29-30. It is well-settled that "adequate compliance with the procedures prescribed . . . in most cases assure[s] much if not all of what Congress wished in the way of substantive content in an IEP." See Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982). We believe that this case is no exception.

The dissent apparently believes that the substantive content of the IEP was inadequate despite the Board's compliance with the Act's procedural requirements. The dissent cites the IEP's failure to acknowledge that Brett had gone into a "crisis" and refused to attend class altogether, its failure to update goals and methods from previous IEPs, and the inconsistency in its methods for reaching prescribed goals. When the IEP was revised in June of 1995, however, Brett's complete refusal to attend class was just surfacing. Moreover, between June and August, the school system could not get Brett to agree to an evaluation, so it had little new information upon which to rely in revising the IEP.

We agree with the ALJ and the district court that the IEP developed on August 30, 1996, could have been improved. The school system is not

20

ciencies in the IEP existed, we agree with the district court that none of the alleged deficiencies relied upon by the ALJ constituted a denial of a FAPE.

To support a finding that a student has not been provided with a FAPE, procedural violations must be serious and cause the student to lose educational opportunity. See Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 982 (4th Cir. 1990) (finding school board's violation of state and federal procedural notice requirements did not cause student to lose educational opportunity). The ALJ's primary concerns about the procedural deficiencies in the IEP were that one goal was unchanged from the April 1996 meeting (although the goal was approved by Brett's parents as part of the IEP at the June 1996 meeting); at least two of the goals and objectives were unchanged since the June 1996 meeting; Brett's educational performance was not modified at the June or August meetings; the IEP failed to list the appropriate accommodations for a student recommended for a Intensity V; and the IEP neglected to list Brett's failure to attend class or school. While we agree with both the ALJ and the district court that the IEP developed on August 30, 1996, could have been improved, none of these alleged procedural violations rises to a level indicating that Brett lost educational opportunity.

That some goals were unchanged, in and of itself, is not significant. The ALJ failed to articulate or specify how the goals had become outmoded. In fact, the first goal listed on the IEP-- demonstrating acceptance of school routines by attending school on a regular basis and attending all classes on time -- clearly was a consistent, and

_____

required, however, to develop a perfect IEP. Instead, the proper standard is whether the IEP is "reasonably calculated" to confer educational benefit. See id. at 206-07. We agree with the First Circuit when it stated:

> The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation.

Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993).

21

probably the most important, goal for Brett. Furthermore, without a further psychological evaluation by the school psychologist, the school system had little new information on Brett's condition with which to revise the IEP, except the evaluations of the Sheppard Pratt Hospital and the American Day Treatment Center, which the CARD Committee did consider. Because Brett had not been in school since June 10, he had no new academic evaluations, and thus his educational performance would not have been modified. In addition, his last grades for the 1995-96 school year were based only upon the work he completed, and he received all As and Bs. Cf. John Doe v. Defendant I, 898 F.2d 1186, 1190 (6th Cir. 1990) (noting that student's most recent grades were known by both his parents and school officials). The district court concluded that "[a]ny minor deficiencies in the IEP in terms of describing Brett or setting objective criteria for goals could have been corrected."[23] (J.A. at 473.)

Furthermore, the district court relied upon the Yaders' failure to challenge any of the alleged deficiencies at the August 30, 1996, CARD Committee meeting when it concluded that the school system did not deny Brett a FAPE. The district court noted that "[n]owhere did the Yaders challenge other aspects of the IEP as being sufficiently deficient by themselves to constitute a denial of FAPE." (J.A. at 466.)

_____

[23] The dissent, relying upon Spielberg v. Henrico County Pub. Schs., 853 F.2d 256 (4th Cir. 1988), argues that after-the-fact correction of an IEP does not conform with the IDEA. The dissent's reliance upon Spielberg, however, is misplaced. See post at 34-35. In Spielberg, the placement decision was made before the IEP was developed. In Brett's case, the IEP was developed at a meeting attended by the Yaders, as required by 20 U.S.C.A. § 1401(a)(20) (West Supp. 1998). The Yaders participated in the development of the IEP and had the opportunity to make objections. Thus, the school system here, unlike the school system in Spielberg, complied with the procedural requirements of the IDEA.

While we agree with the dissent that modifications may not be made to an IEP without scheduling a meeting and notifying the parents in compliance with 20 U.S.C.A. § 1401(a)(20), if a school system has met the procedural requirements of the IDEA, minor deficiencies in the IEP do not necessarily deny a child a FAPE. As long as the IEP is "reasonably calculated" to enable the child to receive educational benefit, the child has not been denied a FAPE. See Board of Educ. v. Rowley, 458 U.S. 176, 179-81 (1982).

22

Instead, the Yaders challenged only the issue of residential placement and timing of the placement.

Although not cited by the district court, the testimony at the due process hearing and at the bench trial supports the district court's conclusion. David Cross, placement specialist for the Montgomery County Public Schools, testified at the bench trial that everyone agreed to the specific goals and objectives discussed at the August 30, 1996, CARD Committee meeting, and that neither the Yaders nor their counsel suggested that additional, specific goals needed to be added. When asked whether she or her counsel had criticized the IEP at the August 30, 1996, meeting, Ms. Yader testified, "I can't honestly say." (J.A. at 162.) While the district court may have explained more fully why it rejected the ALJ's findings with respect to deficiencies in the IEP, we do not believe that the district court committed reversible error under the Doyle standard. In conclusion, none of these alleged procedural deficiencies rose to the level of denying Brett educational opportunity.

B. Substance of IEP

Once we have determined that the state has complied with the IDEA's procedural requirements in developing and implementing the IEP, we turn to the second prong of the Rowley inquiry: whether the IEP is "reasonably calculated" to enable the child to receive educational benefits.[24] See Rowley, 458 U.S. at 206-07. The CARD Com-

_____

[24] The dissent is mistaken in its impression that we believe that compliance with the IDEA's procedural requirements "cures" substantive deficiencies in a child's IEP. See post at 30 n.1. We recognize, as our majority opinion makes clear, that the Supreme Court's test in Rowley is a two-pronged test. This Circuit has previously indicated, however, that the second prong of the Rowley inquiry is more difficult to satisfy than the first. See Tice v. Botetourt County Sch. Bd., 908 F.2d 1200, 1207 (4th Cir. 1990). As we noted in Tice:

> [T]he [Supreme] Court made clear in Rowley [that] once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals. Neither the district court nor this court should disturb an IEP simply because we disagree with its con-

23

mittee recommended Intensity V special education services, with an "interagency option for [a] residential[placement]," noting that Brett was scheduled for an interview at RICA. (J.A. at 275.) In the meantime, Brett was given an interim placement of Intensity III services at Richard Montgomery High School. The interagency option for a residential placement gave RICA the prerogative to enroll Brett as a residential student upon its evaluation of Brett's needs.

Parents are entitled to reimbursement for their expenditures on private special education services "if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." Burlington, 471 U.S. at 369. Parents may place a child in a private educational institution if they disagree with the child's proposed IEP without waiving their right to potential reimbursement later, but they do so at their own financial risk; they will be barred from obtaining reimbursement "[i]f the courts ultimately determine that the IEP proposed by the school officials was appropriate." Id. at 374. The Yaders claim that they are entitled to reimbursement for unilaterally placing Brett at Grove because the CARD Committee's Intensity V placement at RICA with an interagency option for residential services was inappropriate to meet Brett's special education needs.

We have held that a residential placement that is necessary for "medical, social, or emotional problems that are segregable from the learning process" need not be funded by the local education agency. Denton, 895 F.2d at 980. The ALJ made a conclusory determination that Brett needed a residential placement for educational reasons, noting under the "Findings of Fact" portion of her opinion that "[Brett] needs a residential placement in order to achieve educational benefit." (J.A. at 307.) Later, she stated, "It is clear from the record, including the testimony of Mr. Chorney and Ms. Kelty, as well as the reports from the American Day Treatment Program and Sheppard Pratt, that

_____

> tent. Rather, we must defer to educators' decisions as long as an IEP provided the child "the basic floor of opportunity that access to special education and related services provides."

Id. (internal citation omitted) (quoting Board of Educ. v. Rowley, 458 U.S. 176, 207-08 (1982)). We believe that Brett's IEP provided him with "the basic floor of opportunity." Id.

24

a residential program is necessary for [Brett] to achieve educational benefit." (J.A. at 322.) The ALJ, however, did not provide well reasoned explanations for her determination that Brett needed a residential placement for educational reasons. Thus, her finding with respect to Brett's need for residential placement for educational reasons is entitled to little weight. See Doyle, 953 F.2d at 105 (noting that in determining what weight to give an administrative decision we should consider the ALJ's methods in arriving at his decision). For example, the ALJ relied in part on Ms. Kelty's testimony, but Ms. Kelty, the principal of RICA, testified that it is "a matter of semantics of whether it's an educational reason or a clinical reason." (J.A. at 140). Similarly, although she relied in part on the testimony of Mr. Chorney, the executive director of the Grove School, the ALJ did not explain why she drew the conclusion from Mr. Chorney's testimony that Brett needed a residential placement for educational needs. While Mr. Chorney testified that Brett "definitely needs a residential program," (J.A. at 237), he did not refer to any educational reasons for a residential placement. Instead, Mr. Chorney discussed the opportunity a residential placement at the Grove School provided for students to "bond with staff since they spend so much time together." (J.A. at 237.)

The district court rejected the ALJ's finding, concluding that the CARD Committee's proposed placement was sufficient to meet Brett's special education needs. The district court found that Brett's educational needs were segregable from his non-educational needs. Based upon a preponderance of the evidence, we conclude that the district court did not err in determining that Brett's educational needs were segregable from his non-educational needs and that it was his non-educational needs which necessitated a residential placement.

There was consistent testimony at the administrative due process hearing indicating that Brett needed a residential placement. The evidence was equivocal, however, as to whether such placement was necessary for educational or non-educational needs. For example, the testimony of Mr. George Moore, a placement specialist and CARD Committee member, was contradictory. Mr. Moore testified that "getting a child to school" was both a "parent need" and "an educational need." First, Mr. Moore testified that getting a child to school "[is] a family or parent responsibility." (J.A. at 60.) Upon further question-

25

ing, however, he testified that it was a "special education need" because regular school attendance was listed as a need on Brett's IEP. (J.A. at 60.) Mr. David Cross, a placement specialist employed with the Montgomery County Public School System who attended the August 30 CARD Committee meeting, testified less equivocally. He stated that after an "active discussion by the committee members" at the CARD Committee meeting, they concluded that "intensity five services were sufficient for school purposes" and "[t]hat the reason for residential services was for other reasons" including "family concerns [and] concerns with school attendance and other mental health issues." (J.A. at 88.) Later, Mr. Cross did state that with regard to the difficulty in getting Brett to school, it was a matter of "interpretation whether it's educational or family related." (J.A. at 99.)

Many of the witnesses consistently testified, however, that Brett performed well academically when he was at school and had few disciplinary problems at school. Mr. Moore testified that when Brett was at school, "he didn't cause problems," "he did his work," and "he did fine." (J.A. at 20.) Much of the testimony regarding Brett's need for a residential placement focused upon his hostile and oppositional behavior at home and his parents' inability to get him to attend school. For example, Mrs. Yader testified that in March of 1996 Brett's attendance at school and academic performance were greatly improved, and yet his behavior at home was angry and bordering on violent. Mrs. Yader also testified that "[b]ehavorial problems at school isn't [sic] Brett's problem" and that Brett does not have behavioral problems "with [anyone] else in the whole world" except his family. (J.A. at 163.)

This testimony, taken together, points to the conclusion that Brett functioned well when in an academic setting and that his primary conflicts arose at home with his parents. Residential care is only required if the "educational benefits which can be provided through residential care are essential for the child to make any educational progress at all." Denton, 895 F.2d at 980. Accordingly, the district court held that the CARD Committee's placement decision was appropriate, following this Circuit's holding that a residential placement that is necessary for "medical, social, or emotional problems that are segregable from the learning process" need not be funded by the local education agency.[25] See id.

_____

[25] The dissent contends that the most serious flaw with Brett's IEP was its failure to require a residential placement. See post at 30. We disagree.

26

The Yaders claim that Grove was a more appropriate placement for Brett than RICA because it offered honors classes, such as advanced math and chemistry, that RICA did not offer. The IDEA does not require, however, that a school system fund the best possible placement for a child. "The [IDEA] requires only that the child be able to benefit from the instruction that [he] receives, not that [he] be able to maximize [his] potential commensurate with the opportunity provided nonhandicapped children." Id. We conclude that Brett could have made educational progress at RICA, in a residential placement for non-educational reasons.

In making a placement suggestion, the CARD Committee had to consider its obligation to comply not only with the statutory provisions of the IDEA, but also with those of the Code of Maryland and Maryland's regulations implementing the IDEA. Although the Maryland Code provides that "[a] child who needs special education services that are not provided in a public county, regional, or State program shall be placed in an appropriate nonpublic educational program that offers these services," see Md. Code Ann., Educ. § 8-406(a)(1) (Michie 1997), the Maryland regulations provide, inter alia, that a student with disabilities may be considered for nonpublic placement only when the local school system or the state and local agencies, or both, cannot offer the appropriate special education and required related services, see Md. Regs. Code tit. 13A, § 05.01.12(B) (1991). The CARD Committee, in making a placement determination,

_____

As the dissent correctly argues, residential care is required if necessary for the child to make any educational progress at all. See Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 980 (4th Cir. 1990). A residential placement that is necessary for medical, social, or emotional problems segregable from the learning process itself, however, need not be funded by the local educational agency. See id. The reason for Brett's failure to attend school was defiance toward his parents. Such oppositional and defiant behavior is an emotional problem causally unrelated to the learning process. As we have previously stated, testimony at the due process hearing indicated that Brett functioned well when at school and performed well academically. Based on this, we agree with the district court's determination that Brett suffered from an emotional problem that is segregable from the learning process. Therefore, we conclude that the school system's placement was proper.

27

must also place a child as geographically close to the child's home as possible. See 34 C.F.R. § 300.552(a)(3) (1997).

Based upon the preponderance of the evidence, we agree with the district court that the placement at RICA with an interagency option for residential services was proper. We have noted that "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals." Tice v. Botetourt County Sch. Bd. , 908 F.2d 1200, 1207 (4th Cir. 1990) (citing Rowley, 458 U.S. at 207-08). We are required to defer to educators' decisions as long as the IEP provides "the basic floor of opportunity that access to special education and related services provides." Id.

IV.

Mindful of the deference due the ALJ under this Circuit's precedent in Doyle, we nevertheless affirm the district court's rejection of the ALJ's findings. The district court, while acknowledging the findings of the ALJ, adequately rebutted those findings before determining that the IEP was developed and implemented in a timely fashion at the beginning of the school year, that there were no serious procedural deficiencies that resulted in Brett's loss of educational opportunity, and that a residential placement to meet Brett's non-educational needs was appropriate and complied with the IDEA. Accordingly, the Yaders are not entitled to reimbursement for unilaterally placing Brett at Grove during the 1996-97 school year.

AFFIRMED

HAMILTON, Circuit Judge, dissenting:

The fundamental error in the majority's opinion is its holding that Brett's IEP was substantively sufficient to provide him with a free appropriate public education for the 1996-97 school year. See supra at 28. Because the IEP contains serious substantive defects that denied Brett a free appropriate public education, the Yaders are entitled to reimbursement for enrolling Brett in the Grove School. I, therefore, respectfully dissent.

28

I

The IDEA defines a "free appropriate public education" as special education and related services that (1) are provided at public expense, under public supervision and direction, and without charge; (2) meet the standards of the State's educational agency; (3) include an appropriate preschool, elementary or secondary school education in the State; and (4) are provided in conformity with the student's IEP. See 20 U.S.C. § 1401(a)(18). The IDEA requires that an IEP include, inter alia, (1) a statement of the student's present level of educational performance; (2) a statement of annual goals and short-term instructional objectives; (3) a statement of specific educational services to be provided to the student; and (4) appropriate objective criteria, evaluation procedures and schedules for determining whether the instructional objectives are being achieved. See 20 U.S.C. § 1401(a)(20).

The IEP is intended to be the school district's "blueprint" for providing a free appropriate public education to a disabled student. See School Comm. of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 368 (1985). Thus, it is logical to conclude that a program constructed on a faulty blueprint will itself be faulty. In other words, when educational services are provided in conformity with an IEP that does not accurately reflect the student's circumstances or needs, those educational services will neither address those circumstances nor meet those needs.

We determine whether an IEP is appropriate and whether the school district has fulfilled its obligations to provide a student with a free appropriate public education by determining (1) whether the school district has complied with the IDEA's procedural requirements when developing and implementing an IEP, and (2) whether the IEP is "reasonably calculated" to enable the child to receive educational benefits. See Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 (1982). While I agree with the majority that the school district complied with the procedural requirements of the IDEA, see supra at 12-20, I disagree with the majority's implicit holding that the IEP accurately reflected Brett's circumstances and needs, and was, therefore, reasonably calculated to provide him with educational benefits. My disagreement rests on the IEP's failure to (1) document the full extent of Brett's disability; (2) require a residential

29

placement for educational purposes; (3) match its goals to its methods; and (4) reconcile its methods with placement at RICA.**1**

Of these failures, the most obvious is the IEP's failure to note anywhere that Brett had gone into "crisis" and refused entirely to attend class. Without this information, the full extent of Brett's disability could not be considered in developing a program that would provide him with an adequate education. Furthermore, this omission caused the IEP to misrepresent Brett's present level of educational performance. Since Brett refused to attend school, he was, perforce, making no educational progress.**2**

The omission of Brett's full disability at least contributed to--and perhaps caused--the IEP's most serious flaw, namely that the IEP fails to require a residential placement so that Brett can make educational progress. Brett's refusal to attend classes should have been a significant factor in deciding whether a residential program was educationally necessary. Since it was clear that a residential program would be needed to get Brett to attend classes at all, then a fortiori it should have been clear that a residential program was educationally necessary. The ALJ understood this, but the district court and majority have failed to grasp or appreciate such logic. In concluding that Brett needed a residential placement--but for non-educational reasons only--the district court and the majority, see supra at 25-26, both rely on the testimony of the parties' experts. The testimony both cited, however, does not support their conclusion. For example, Sherri Kelty, the principal at RICA and one of the School Board's experts, testified:

_____

**1** I also disagree with the majority's apparent belief that complying with the IDEA's procedural requirements somehow cures substantive deficiencies in the IEP. See supra notes 22 and 23 at 20-21, 22. The Supreme Court's test in Rowley is a two-pronged test that requires courts to scrutinize both the procedure and substance of an IEP. See Rowley, 458 U.S. at 206-07. The majority, however, prunes the second Rowley prong down to a stub.

**2** Brett's current level of educational performance should not be considered, as the majority indicates, supra at 21, to be his level of performance when he last attended school. The fact that Brett earned As and Bs when he last attended school became irrelevant when he stopped attending school altogether, for his educational performance then dropped to zero.

30

> [W]e felt that we could service [Brett] much better in resi-
> dence, <u>because we had a much higher percentage of a
> chance of getting him into school, which is certainly where
> you have to implement the IEP goals</u>, and we found him
> appropriate for our [residence program].
>
> . . .
>
> I think that it becomes a matter of semantics of whether it's
> an educational reason or a clinical reason [for residential
> placement]. The bottom line when we look at a student at
> RICA at pre-admission, <u>if we're going to implement the
> goals, especially the goals for a student who has serious
> emotional disturbance, they have to be [in school]</u>. That's
> sort of the basic premise that they are going to be there,
> <u>otherwise they can't benefit from the program</u>. .. .
>
> And so basically a student with Brett's kind of profile is a
> student we would say <u>would need residence in order for the
> RICA program to work, because you can't do therapy if the
> student isn't in school</u> either, because we don't do therapy
> in the residential piece. So <u>the student has to show up in
> school</u>.

(J.A. 127, 140-41) (emphasis added). Richard Chorney, the executive
director of the Grove School, testified that he agreed with Ms. Kelty's
assessment of Brett's needs. In response to the question of whether
Brett required a residential program in order to receive an appropriate
education, Mr. Chorney testified:

> Yeah, I agree with the person who spoke from RICA that
> [Brett] definitely needs a residential program. . . .
> [Regarding] <u>his need for residential placement, the environ-
> ment can be carefully managed to encourage his compliance
> with treatment or he can simply refuse to attend the school</u>
> and his family is in a power struggle on a daily basis. Also
> a greater opportunity for students in residential placements
> to bond with staff since they spend so much time together.
> That's particularly true here. The people that put them to

31

bed at night are the same people that wake them up in the morning.

(J.A. 237-38) (emphasis added). The district court also quoted from a report from the Sheppard Pratt Psychiatric Hospital, which had examined Brett:

> Brett's avoidance of stressful experiences, his refusal to attend outpatient psychotherapy and his noncompliance with the medication prescribed by previous psychiatrists have resulted in his failure to attend and learn in his current school placement.

(J.A. 469) (emphasis added).

It is difficult to see how the majority or district court can read this testimony and fail to conclude that Brett needs a residential program in order to receive any educational benefit at all. Contrary to the majority's characterization, see supra at 25, this evidence can hardly be viewed as "equivocal." Furthermore, the testimony of George Moore, another witness quoted by the majority, supra at 25, cannot be interpreted as "contradictory" merely because he testified that residential placement is both an educational and non-educational need. Moore plainly testified--consistently with the testimony quoted above--that a residential placement was necessary "[b]ecause [for] the rest of the IEP to be implemented, [Brett] has to be in school." (J.A. 60).

We have held, as the majority recognizes, see supra at 26, that residential care is required if it is "essential for the child to make any educational progress at all." Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 980 (4th Cir. 1990) (emphasis added). It is clear from the testimony quoted above that a residential placement is essential to ensure that Brett attends class. Common sense would indicate that Brett needs to attend class in order to make educational progress. Ergo, residential placement is essential for Brett to make educational progress.**3**

_____

**3** The majority considers such syllogistic reasoning employed by the ALJ to be "conclusory," "not . . . well reasoned" and, therefore, "entitled

The lack of residential placement for educational purposes is, alone, sufficiently serious to deny Brett a free appropriate public education. Unfortunately, there is more. The IEP also contains conflicting methods for reaching its stated goals. For example, the IEP stated that Brett should learn how to convey information to an audience and how to write effectively. It is clear these goals were copied from earlier versions of Brett's IEP, as evidenced by the dates listed on the IEP's Goals and Objectives forms. Although the IEP stated that these goals were to be met, in part, through assistance from the classroom teacher, the IEP elsewhere stated that Brett would spend his entire school day with special education teachers, and no time with classroom teachers. It is reasonably clear, therefore, that the August IEP merely copied aspects from the earlier IEPs without fully updating the goals and objectives to reflect Brett's current situation.**4**

Finally, the IEP does not reconcile differences between its stated goals and objectives on the one hand, and its recommendation for placement at RICA on the other. The August IEP states--as did those from April and June--that several of Brett's goals should be accom-

_____

to little weight." Supra at 24-25. It is difficult to understand why it is well reasoned to believe that Brett can make educational progress in a program he does not attend. Whatever the sources of Brett's emotional problems and failure to attend school, see supra note 24 at 23-24, he needed a residential placement "to make any educational progress at all." Denton, 895 F.2d at 980. Contrary to the majority's assertion, the Yaders were not seeking to have the school system fund "the best possible placement" for Brett, see supra at 27; they were seeking a placement where Brett would attend class and therefore be able to make some educational progress.

In addition, the majority mischaracterizes Denton to require that, in order to receive reimbursement for residential care, the student's emotional problems must be "causally [ ]related to the learning process." See supra note 24 at 23-24. Denton only requires that residential placement be necessary, as is the case here, for the student to make any educational progress at all. See Denton, 895 F.2d at 980.

**4** The point is not, as the majority believes it to be, supra at 21-22, that the goals and methods were left unchanged in the August IEP. The point is that the IEP's goals and methods were not updated to reflect changes in Brett's situation after he went into crisis, and that the IEP called for wholly inconsistent methods of reaching those goals.

33

plished through Honors level accommodations. However, the IEP recommends placement at RICA, and RICA does not offer Honors level classes. Placement at RICA therefore conflicts with the IEP's methods of attaining its goals.

The majority believes, as did the district court, that these deficiencies could have been corrected after-the-fact.**5** See supra at 22. However, such an approach does not conform with the IDEA, its regulations, or the cases applying them. Educational services are to be provided "in conformity with the [IEP]," 20 U.S.C. § 1401(a)(18)(D), and educational placement is to be "based on[the] IEP," 34 C.F.R. § 300.552(a)(2). See also Spielberg v. Henrico County Pub. Schs.,

_____

**5** This highlights yet another error in the majority's opinion, namely its holding that the district court properly reviewed the ALJ's decision under the standard of review set forth in Rowley, 458 U.S. at 205-06, and Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 105 (4th Cir. 1991).

District courts reviewing the decisions of state ALJs must make independent decisions based upon a preponderance of the evidence, while giving due weight to the ALJ's findings of fact. See Rowley, 458 U.S. at 205-06. In fact, the ALJ's findings are entitled to be considered prima facie correct. See Doyle, 953 F.2d at 105. If the district court chooses not to accept a finding of the ALJ, the district court must carefully explain why it does not. See id.

For the most part, the district court heeded the directives of Rowley and Doyle. The district court generally accepted the ALJ's findings and, for most of the findings it rejected, gave reasoned explanations why it rejected those findings. There were, however, several glaring exceptions. The district court rejected certain crucial findings about the sufficiency of Brett's IEP without giving any explanation why it rejected those findings. The ALJ had found that the IEP (1) was internally inconsistent and/or contradictory; (2) had not been updated to reflect Brett's current educational and emotional performance; and (3) failed to include appropriate criteria and evaluation procedures for measuring the goals contained in the IEP. These facts were significant in the ALJ's conclusion that the IEP was defective. The district court, however, rejected these findings, and the sum total of its "analysis" consisted of the following cursory phrase: "Any minor deficiencies in the IEP in terms of describing Brett or setting objective criteria for goals could have been corrected." (J.A. 473). Such action did not accord the ALJ's findings of fact with the weight they were due, and thus constituted legal error.

34

853 F.2d 256, 259 (4th Cir. 1988) (holding that placement of the student, after which an IEP was developed to conform with the placement, was a procedural violation sufficient to deny the student a free appropriate public education). Put another way, the IEP is to be the blueprint for an appropriate educational program, not a chronicle of what services were provided. Furthermore, when an IEP is defective because it inaccurately describes the student, incorrectly assesses his situation, and inappropriately proposes certain treatment, then services conforming to, and the placement based upon, the implementation of that IEP will also be defective. See 20 U.S.C. § 1401(a)(18)(D); 34 C.F.R. § 300.552(a)(2).

II

In conclusion, the deficiencies in Brett's IEP are serious and, in my opinion, those deficiencies deprived him of a free appropriate public education. I would, therefore, grant the Yaders a reimbursement for the costs of placing Brett in the Grove School for the 1996-97 school year.