man, State Board of Education, State of North Carolina, Third Party Plaintiffs.

No. 88–2184.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1989.

Decided Feb. 9, 1990.

**BURKE COUNTY BOARD OF EDUCATION, Plaintiff–Appellee,**

v.

**Christian Lee DENTON, By and Through his parents and legal guardian; Lee Edward DENTON, Defendants–Appellants.**

**Carolyn DENTON, Defendant,**

v.

**Phillips A. CRAIG, State Superintendent of Public Instruction, State of North Carolina; Haworth, Howard, Chair-**

David B. Puryear, Jr. (Booth, Harrington, Johns & Campbell, Greensboro, N.C., Roger Manus, Carolina Legal Assistance, on brief) for defendants-appellants.

Ann L. Majestic (Allison Brown Schafer, Tharrington, Smith & Hargrove, Raleigh, N.C., on brief) for plaintiff-appellee.

Before RUSSELL and PHILLIPS, Circuit Judges, and FOX, United States District Judge for the Eastern District of North Carolina, sitting by designation.

1. *See Willie M. v. Hunt,* No. CC–79–294 (W.D.N. C.1980) (consent decree); *see also Willie M. v.*

PHILLIPS, Circuit Judge:

Christian Lee Denton (Chris), by and through his parent and legal guardian, Lee Edward Denton, appeals from the judgment of the district court affirming, with minor modifications, the educational program proposed for Chris by the Burke County, North Carolina, Board of Education (Board). The Dentons had initiated administrative review procedures under the Education of the Handicapped Act (EHA), 20 U.S.C. §§ 1400–1485, and the parallel state law, N.C.Gen.Stat. §§ 115C–106 to 115C–145 (1987), to contest the special education program proposed by the Board. A local hearing officer concluded that the program proposed was appropriate and in the least restrictive environment. Upon appeal by the Dentons, a state review officer found that the proposed program did not meet state and federal law standards. The Board then brought this action in district court as an aggrieved party under the EHA, and the court rejected the review officer's conclusions and reinstated the hearing officer's decision in its entirety. We agree with the district court that the educational program proposed by the Board, as modified by the local hearing officer, meets the requirements of federal and state law and therefore affirm.

I

Chris, now nineteen years old, is autistic and moderately mentally handicapped. He has the severe problems most autistic people face communicating and controlling himself. Until reaching the age of eighteen, he was included in the "Willie M" class of individuals in North Carolina.[1] These individuals are seriously emotionally, neurogically, or mentally handicapped and exhibit violent or assaultive behavior. Chris cannot manage his own behavior; his behavior at all times must be managed by others.

Because of his aggressive behavior, and upon the recommendation of a Board administrative committee, the Dentons placed

*Hunt,* 657 F.2d 55 (4th Cir.1981).

Chris in the Triad Home for Autistic Individuals in High Point, North Carolina. While living at the Triad Home from 1984–1987, Chris received educational services at the Gateway Education Center in Greensboro. During this time, highly structured programs of educational services and complementary behavior management programs were utilized at both Triad and Gateway, and were successful in promoting Chris' learning and reducing the incidents of aggressive behavior. Both the residential and educational services were provided at public expense.[2]

In late 1986, the Dentons began planning in earnest to attain their goal of returning Chris to the family home. Chris also would be entering his last year of eligibility for Willie M funds, and a new source of funds would be required to provide for the total care he needs. Board members were not included in this planning process and were not informed until June 1987 that Chris would be returning to Burke County and their jurisdiction.

In June 1987, the Dentons presented a plan developed by representatives of TEACCH,[3] a division of the University of North Carolina Psychiatry Department, and Chris' former teacher at Gateway. The proposed plan (PUSH plan), designed to replicate the successful Gateway–Triad plan as closely as possible and coordinated by a private contractor, called for Chris to enroll at the Western Carolina Center, a facility operated by the North Carolina Department of Human Resources, for day

educational services. He would return home at night and for weekends. Although Chris would not be enrolled in its schools, the Board was asked to fund a one-on-one day program aide, transportation to the Center, and one-half the cost of a Direct Care Coordinator, whose function was to provide and supervise habilitation services in the Denton home. The Department of Human Resources agreed to fund the other half of the Coordinator and additional home care costs, apparently as part of the Willie M program. The Board agreed to fund the aide and the transportation costs as educational services costs, but objected to the funding of a position that they asserted primarily involved controlling Chris' behavior.

The Board's efforts to develop an individualized education program (IEP) for Chris as required by the EHA, *see* 20 U.S.C. §§ 1401(19); *id.* § 1414(a)(5); *see also* N.C. Gen.Stat. § 115C–113(f) (1987), were hampered by a lack of up-to-date evaluations from Gateway. The Board offered a temporary placement plan while the IEP was being developed, but the Dentons refused the offer. The Board did not provide notice to the Dentons or develop the IEP within the time periods provided under North Carolina law,[4] *see id.* § 115C–113(b), (c),[5] but did present an IEP just four days after receiving Chris' evaluations.

The IEP called for day enrollment at a local school with a program closely following the Gateway program, including provi-

2. Because Chris resided and attended school in Guilford County, North Carolina, the Guilford County Board of Education, rather than the Burke County Board, was responsible for funding Chris' educational program at Gateway Center. The Triad Home is a facility operated and funded by the North Carolina Department of Human Resources.

3. TEACCH is an acronym for Treatment and Education of Autistic and Communications–Handicapped Children.

4. Under 20 U.S.C. § 1412(5)(A), each state qualifying for federal assistance must establish procedural safeguards as required by § 1415. Prior written notice must be given a reasonable time before any change in educational placement of a handicapped child. *See id.*

§ 1415(b)(1)(C); 34 C.F.R. § 300.504(a). The regulations also provide that a meeting to develop an IEP must be held within 30 days of a determination that a child needs special education and related services, and that the IEP must be implemented as soon as possible following the meeting or meetings. *Id.* §§ 300.-342(b)(2), 300.343(c).

5. Under North Carolina law at the time, the local education agency had 30 days to provide notice to the parents when a child in a special education program was transferred. Within 30 days of the notice, the local education agency was required to present a diagnosis and evaluation, including the IEP. N.C.Gen.Stat. § 115C–113(b), (c) (1987). The law was amended in 1989 and the procedures modified. *See id.* § 115C–113(c) (1989).

sion of a one-on-one aide. The physical environment would be the same, pre-vocational and vocational training would be provided, and the successful behavior management program would be replicated. The Board was even willing to accept the PUSH plan IEP for implementation in future years, but the Dentons refused to agree to this approach because the total plan did not include in-home care. Recognizing that Willie M funding for residential services would soon be lost, the Dentons adopted the position that the Board was required under federal and state law to provide all the in-home services, now asserted to be educational, for what amounted to 24 hour a day, 365 days a year care.[6]

The Dentons reasserted their right to a "due process" hearing under the EHA, *see* 20 U.S.C. § 1415(b)(2); *see also* N.C.Gen. Stat. § 115C–116 (1987)[7], which had been stayed by a local hearing officer until Chris' evaluations were completed and a new IEP proposed by the Board, after they rejected the Board's IEP. The hearing officer found as an essential fact that Chris cannot manage his own behavior. In addition, consistency is a key consideration in controlling Chris' behavior: "The same behavior management program must be used at all times, in all environments, to control the child's behavior." Joint Appendix (J.A.) I, at 32, para. 48. "Self-control is a goal for the child, although it is very likely that it will never be attained." *Id.*, para. 47.

The hearing officer's further findings endorsed the IEP proposed by the Board. The Board offered placement in one of its schools with some opportunity to interact with non-handicapped students (mainstreaming) and a program consistent with the successful Gateway program. The educational program needed to be coordinated with the home environment so that the same behavior management approach, including the critically important aversion therapy which the Western Carolina Center

had refused to implement, would be utilized in all aspects of Chris' life. Like the Gateway program that successfully promoted Chris' learning skills, the Board's IEP did not call for educational services or residential training beyond the regular school day.

In his critical "conclusion of law," the hearing officer distinguished the educational program from the behavior management program for Chris.

> The behavior management program maintains and controls the behavior of the child so that other activities, educational as well as non-educational, can take place and the child does not become a threat to the safety of himself or others. Educational programs enable the child to learn new skills and concepts. When new behavior management techniques are attempted for the purpose of advancing the child to less intensive external controls, such activities are part of an educational program. It does not necessarily follow that the use of these new control techniques, and the resultant reinforcement of learning, takes place only in an educational setting. To hold otherwise is to specify that everything that is done to or for an individual is an educational activity, a premise that the hearing officer cannot accept as the intent of federal and state law governing the provision of education to children with special needs.

*Id.* at 36, para. 14.

The hearing officer therefore ruled that Chris does not need a residential program of education or an educational program 24 hours a day or 365 days a year in order to achieve educational benefits. He saw as the critical requirement the need to coordinate the behavior management program at school and in the home, and for this reason he ordered the Board to set up a team approach, as used at Gateway and Triad, to coordinate home and school envi-

---

**6.** The district court noted, for example, that the Dentons changed the title of the Direct Care Coordinator to "Lead Teaching Parent," in an effort to emphasize educational responsibilities.

**7.** The North Carolina review procedures have been amended and now provide that administrative review is to be initiated and conducted in accordance with the state Administrative Procedure Act. N.C.Gen.Stat. § 115C–116(d) (1989).

ronments, and procedures to facilitate exchange of information. With these modifications, and an additional requirement that Chris be provided educational services during the summer school term, the hearing officer endorsed the Board's IEP as appropriate and in the least restrictive environment. Although the hearing officer found that the Board had not met the procedural requirements of federal and state law, he ruled that Chris was not entitled to compensatory special education because the Board's faults had not deprived him of any educational benefits.

The Dentons appealed the hearing officer's decision and a state review officer was appointed to independently review the administrative record. *See* N.C.Gen.Stat. § 115C–116(b1) (1987). The review officer accepted the facts as found by the hearing officer, but he drew the exact opposite legal conclusion that the Board's IEP was not adequate under state and federal law. He reasoned that a person with Chris' handicap "cannot progress educationally unless his total environment, both educational and residential, [is] highly structured and aimed at promoting sameness throughout his daily experience." J.A. I, at 22. The Board's IEP was inadequate "because it does not provide for services beyond the normal school day and beyond the normal school term.... Instruction beyond the normal school day and beyond the normal school year are necessary in order for [Chris] to achieve educational benefits to the degree commensurate with his potential." *Id.* Chris needed "a residential program of special education and related supportive services," and the least restrictive environment for provision of the residential program was the Denton home. *Id.* at 23. He evaluated the evidence as showing that the instruction needed to continue through most of the hours Chris is awake, at least five days a week. *Id.*[8] The review officer also awarded Chris 106 days of compensatory special education on account of the Board's procedural defaults.

The Board then brought this civil action as a "party aggrieved" under 20 U.S.C. § 1415(e)(2); the Dentons counterclaimed seeking 365–day services during Chris' waking hours and raising related claims under § 504 of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794, and 42 U.S.C. § 1983. The district court received additional evidence, and after reviewing the entire administrative record, reinstated the hearing officer's decision. The court rejected as contrary to the evidence and the law the review officer's conclusion that the Board must establish a residential special education program in the Dentons' home that provides reinforcing behavior management supervision in order to meet the requirements of federal and state law.

Additional facts found by the court were relied upon to support its conclusions. Specifically, the court found that in December 1987 the Dentons had removed Chris from the Triad Home and brought him home, having earlier decided not to enroll Chris at Gateway for the 1987–88 school year, and that, at the Dentons' request, the Board had arranged emergency placement in a local school and implemented its original IEP. The court further found that under this regime Chris continued to make good progress at school despite the fact that aides employed to be with Chris when he was at home were not consistently following the proven behavior management techniques. Chris and the in-home aide have their own separate quarters in the Denton home and contact with the family is limited. The aide's principal responsibility is to provide basic care for Chris, helping him bathe, dress, and eat. The court found that the aides spent much of the time entertaining Chris in the home or by taking him shopping, to the park, or out to eat. The only work tasks Chris attempted at home were ones that he had already performed at school. The aversion therapy and other behavior management techniques were not followed outside the school.

The court also summarily rejected the Dentons' § 504 and § 1983 claims, both of

---

8. The review officer left to the Board the development of a specific program of days and times

of services, consistent with his opinion and the proposed IEP. J.A. I, at 23.

which were apparently premised on an argument that the Board discriminated against Chris and deprived him of a federal law right to full educational benefits by adopting its IEP. In addition, the court agreed with the hearing officer, and disagreed with the review officer, in finding that the Board's violation of the procedural notice requirements under state and federal law did not deprive Chris of any educational benefits. The Dentons were at least partially responsible for any delays as they intentionally avoided informing the Board of their plans until after they were complete, and they voluntarily removed Chris from Gateway, where he could have been receiving educational services during the administrative process.

The Dentons then took this appeal.

## II

■ Although Chris Denton's case has now been litigated for over two years and the record on appeal is voluminous, the range of dispute between the parties, as the district court recognized, is actually quite narrow. There is no dispute that Chris is a handicapped child and has a right under federal and state law to a "free appropriate public education." *See* 20 U.S.C. § 1401(1); *id.* § 1412(1); N.C.Gen. Stat. § 115C–109 (1987); *id.* § 115C–111. The record also makes clear that Chris cannot function by himself, at least at this time, and that he needs close supervision both at school and at home. Though initially dissatisfied with the in-school program proposed by the Board, the Dentons now

seem to accept the Board's IEP as implemented at school. The remaining question, then, is whether federal or state law requires the Board to fund the habilitative services for Chris in the Denton home.[9] We hold, affirming the district court, that neither the EHA nor North Carolina's special education law requires the Board to fund these habilitative services.

### A.

Congress made clear its purpose when it enacted the EHA.

> It is the purpose of this chapter to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C. § 1400(c). Free appropriate public education means "special education," defined as "specially designed instruction ... to meet the unique needs of a handicapped child, including ... home instruction," *id.* § 1401(16)[10], and "related services," defined as "transportation, and such developmental, corrective, and other supportive services ... as may be required to assist a handicapped child to benefit from special education," *id.* § 1401(17).[11] *See id.*

9. In its complaint, the Board proposed as an alternative, should the district court decide that Chris requires residential instruction, that the court direct the Board to provide residential placement outside the Denton home. The only question before this court involves construction of the EHA and the parallel North Carolina law. Our only consideration, therefore, is whether the EHA or North Carolina's special education law requires the Board to fund the services sought by the Dentons.

10. "The term 'special education' means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruc-

tion, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16).

11. "The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children." 20 U.S.C. § 1401(17).

§ 1401(18).[12]

The Supreme Court first considered the reach of the EHA, and specifically interpreted the meaning of the "free appropriate public education" requirement in *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Court emphasized the language of the statute itself in holding that a state satisfies the requirement by "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203, 102 S.Ct. at 3049. Congress did not intend that every special education program necessary to maximize each handicapped child's potential be provided. *Id.* at 199, 102 S.Ct. at 3047. Rather, the IEP, recognized as the "*modus operandi* of the Act," *Burlington School Comm. v. Massachusetts Dep't of Educ.*, 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985), as proposed by the local education agency must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

■ The question in this case is, then, whether the Board's IEP, which does not include a home instruction component, is reasonably calculated to enable Chris to receive educational benefits. Congress recognized that in some instances home instruction or residential placement would be required for the handicapped child to benefit educationally. *See* 20 U.S.C. § 1401(16); *id.* § 1413(a)(4)(B); 34 C.F.R. §§ 300.302, 300.551. If the educational benefits which can be provided through residential care are essential for the child to make *any* educational progress at all, then residential care is required under the EHA. *See Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir.1983); *see also Matthews v. Davis*, 742 F.2d 825, 829 (4th Cir.1984). Where medical, social, or emotional problems are intertwined with educational problems, courts recognize that the local edu-

cation agency must fund residential programs if the requirements of the EHA and *Rowley* are to be met. *See Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 693–94 (3d Cir.1981); *Vander Malle v. Ambach*, 667 F.Supp. 1015, 1039 (S.D.N.Y. 1987). The determination whether services beyond the regular school day are essential for the child to receive any educational benefit is necessarily fact and case specific. *See Kruelle*, 642 F.2d at 692–93; *Drew P. v. Clarke County School Dist.*, 676 F.Supp. 1559, 1566 (M.D.Ga.1987), *aff'd*, 877 F.2d 927 (11th Cir.1989).

■ On the other hand, "[i]t follows from *Rowley* that the Act does not authorize residential care merely to enhance *an otherwise sufficient* day program." *Abrahamson*, 701 F.2d at 227 (emphasis in original). If residential placement is necessitated by medical, social, or emotional problems that are segregable from the learning process, then the local education agency need not fund the residential placement. *See McKenzie v. Smith*, 771 F.2d 1527, 1534 (D.C.Cir.1985) (citing *Kruelle*, 642 F.2d at 693). And *Rowley* makes clear that the EHA requires only that the child be able to benefit from the instruction that she receives, not that she be able to maximize her potential commensurate with the opportunity provided nonhandicapped children. 458 U.S. at 198, 102 S.Ct. at 3046.

The district court found that since Chris returned home and enrolled in a Burke County school, he has continued to make educational progress despite the failure of the home care aides to follow rigorously the successful behavior management program. This finding is not clearly erroneous, *see Matthews v. Davis*, 742 F.2d at 831; Fed.R.Civ.P. 52(a), and undermines the Dentons' factual premise that an absolutely consistent in-home behavior management program is required for Chris to make educational progress and is therefore

---

**12.** "The term 'free appropriate public education' means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appro-

priate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." 20 U.S.C. § 1401(18).

an educational expense. The evidence did not support the Dentons' claim that Chris needs an "educational" program for all his waking hours, 365 days a year or even 5 days a week. *Cf. Drew P. v. Clarke County School Dist.*, 676 F.Supp. at 1565 (24–hour care not needed for every autistic child to make educational progress).

The evidence showed that while Chris was attending a local school which implemented the Board's IEP, his episodes of aggression decreased and his task performance improved. Chris was able to spend more time on individual tasks and more total time during work sessions. He works on more complex and a wider variety of tasks with an improved error rate. His progress is closely monitored as school personnel continue to meet and work on more of the specific goals in Chris' IEP. The only work tasks Chris attempted at home were ones that he had already performed at school. *See Matthews v. Davis*, 742 F.2d at 830 (custodial care not required when reinforcing functional applications at home are sufficient, along with continued training and drills at school, to maintain child's skills).

■ The Dentons do recognize that the dispute in this case is narrowly focused, but they dispute both the scope of the district court's review and the court's specific factual and legal conclusions. The EHA provides that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The reviewing court, in receiving the record of the state administrative proceedings, shall give to those proceedings "due weight." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. The court thus makes a bounded, independent decision—"bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Town of Burlington v. Massachusetts Dep't of Educ. (Burlington II)*, 736 F.2d 773, 791 (1st Cir.1984), *aff'd sub nom.*

*Burlington School Comm. v. Massachusetts Dep't of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The court has discretion to give the administrative findings proper weight, with the concomitant obligation to consider those findings carefully and respond to the administrative resolution of the issues. *Id.* at 792.

The district court carefully reviewed the entire record and after independent review concluded that the local hearing officer's decision should be reinstated. The hearing officer's findings of fact were accepted even by the review officer, and the court agreed that the findings were supported by the evidence. The court also admitted and considered additional evidence that was inconsistent with the review officer's underlying premise that Chris could not make educational progress without complete consistency in the behavior management programs employed at home and at school. The court's opinion shows that it did consider the review officer's conclusions along with those of the hearing officer, but found the review officer's conclusions contrary to the evidence and the law.

■ The essence of the Dentons' argument that due weight was not given to the review officer's conclusions is simply that the court rejected those conclusions. They assert that the decision to which deference is due is the review officer's decision, as opposed to the hearing officer's decision, citing *School Board of Prince William County v. Malone*, 762 F.2d 1210 (4th Cir. 1985). In *Malone*, however, the local and state hearing officers agreed, and it was the decision of the hearing *officers*, not the school board's decision, to which deference was due. 762 F.2d at 1217. Under § 1415(e) and *Malone*, the Dentons' argument that deference was due only to the review officer's conclusions is simply incorrect.

The Dentons also assert that the district court inappropriately considered institutional placement for Chris and was improperly influenced by the financial implications of the case. The Dentons argue that the court's conclusion that in-home services are not educational services was predetermined

by the court's consideration of institutional (*i.e.*, non-educational) placement. The court's opinion gives no indication of predetermination, but rather reflects careful consideration of the facts it found. The Dentons' contention that the court's decision was improperly influenced by financial considerations is similarly flawed. The court noted that financial considerations are not a deciding factor in a case under the EHA. *See generally*, Bartlett, *The Role of Cost in Educational Decision-making for the Handicapped Child*, 48 Law & Contemp. Probs. 7 (Spring 1985) (discussing different approaches courts have taken in dealing with costs of education for handicapped children). The court's brief mention of the costs of the Board's program and the likely costs of the program sought by the Dentons is simply dicta consistent with its fundamental finding that the services sought are not required for Chris to benefit educationally.

The Dentons then attack the court's factual findings. They argue that they should not be "penalized" for failing to implement at home the successful behavior management program; the failure to implement the program only demonstrates the need for services from the Board. They correctly note that no evidence supports the conclusion that Chris could continue to make educational progress without any one-on-one aide services in the home. But these arguments do not respond to the court's critical factual finding that Chris *has* continued to make educational progress under the Board's in-school program and without in-home special education and behavior management instruction.

█ We also believe, contrary to the Dentons' position, that the district court reasonably concluded that the Board's procedural failure did not deprive Chris of educational benefits that would entitle him to extra education days.[13] The Dentons voluntarily removed him from Gateway, where he could have continued his edu-

cation, and refused the Board's offer of a temporary placement while the administrative hearings were being held. The Board's IEP was later implemented when the Dentons requested emergency placement for Chris, and, as we have discussed, he showed significant progress under the Board's plan. The Dentons certainly have no strong equitable argument for invoking the court's discretion to award appropriate relief under § 1415(e)(2) when they intentionally did not inform the Board until practically the last possible moment that Chris would be returning to its jurisdiction. Although the *Rowley* Court emphasized that a reviewing court must ensure that the state has complied with the procedures set forth in the EHA, 458 U.S. at 206, the procedural faults committed by the Board in this case did not cause Chris to lose any educational opportunity. *Cf. Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir.1985) (school board's consistent failure to provide notice and inform dyslexic child's parents of procedural rights is adequate ground for finding that board failed to provide child with free appropriate public education).

The Dentons ultimately fail to establish "the link between the supportive service or educational placement and the child's learning needs." *Kruelle*, 642 F.2d at 694. Chris has benefitted educationally from the instruction provided under the Board's IEP. *See Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049. Federal law requires no more.

### B.

█ The Dentons' argument that North Carolina law, if not federal law, requires that the provision of home behavior management services be deemed educational fails as well. As they point out, a federal court must determine whether an IEP meets the requirements of state law if the state requires a level of substantive benefit greater than that required under federal

---

**13.** Some courts have held that compensatory educational services cannot be awarded under the EHA. *See generally* Comment, *Compensatory Educational Services and the Education for*

*All Handicapped Children Act,* 1984 Wisc.L.Rev. 1469. We limit our consideration of this question to the facts of this case.

law. *See David D. v. Dartmouth School Comm.*, 775 F.2d 411, 417–20 (1st Cir.1985); 20 U.S.C. § 1401(18)(B). North Carolina apparently does require more than the EHA. The special education program must provide the child with an equal opportunity to learn if that is reasonably possible, ensuring that the child has an opportunity to reach her full potential commensurate with the opportunity given other children. *See Harrell v. Wilson County Schools*, 58 N.C. App. 260, 293 S.E.2d 687, 690 (1987) (citing *Rowley*, 458 U.S. at 215, 102 S.Ct. at 3055 (White, J., dissenting)); *see also* N.C.Gen. Stat. § 115C–106(a) (1987) (policy of the state "is to ensure every child a fair and full opportunity to reach his full potential").

But North Carolina law still recognizes the difference between special education services and habilitation services. Although the state statutory definitions of "special education" and "related services" are more expansive than the EHA definitions of those terms, the services the Dentons seek do not fall within the definitions. *See* N.C.Gen.Stat. § 115C–108 (1987). Special education is defined to include certain services categorized as related services under federal law; related services includes "school social work services, parent counseling and training, providing parents with information about child development and assisting parents in understanding the special needs of their child." *Id.* The district court's factual findings compel the conclusion that the in-home services sought by the Dentons are not the kind of services which must be provided, under federal or North Carolina law, by the local education agency.

Habilitation plans, which are developed by the Department of Human Resources for use in its facilities, are separate from the IEP, which is normally developed by the local education agency. The plans are

to be "coordinated, integrated, and internally consistent," *id.* § 115C–113(f), but the statute clearly contemplates a distinction between the kinds of services which might be provided to handicapped "special needs" children. The Dentons recently obtained a license to operate their home as a residential care facility under state laws governing Department of Human Resource programs, *see id.* § 122C–3(14)(b) (1989), further confirming the appropriate categorization of the home care services sought for Chris as habilitation, not education. *Harrell* seems to require that the local education agency provide educational services which will enhance a handicapped child's ability to reach her potential; it does not mandate expansive interpretation of what the statute contemplates as an educational service.

■ The Dentons also contend that the district court erred in applying the federal standard of review to those parts of the review officer's decision based on state law. The EHA mandates that the district court independently review the administrative record and base its decision on a preponderance of the evidence. 20 U.S.C. § 1415(e)(2). No distinction is made between federal and pendent state claims if the claims are brought in federal court. Although the North Carolina Administrative Procedure Act limits a state court reviewing an agency decision to substantial evidence review, *see* N.C.Gen.Stat. § 150B–51(b)(5) (1987), judicial review of special education claims is substantial evidence review *unless* "pertinent federal law or regulation specifies otherwise." *Id.* § 115C–116(b1). The district court properly followed federal procedural law in reviewing independently both the federal and state law claims.[14]

### III

■ We agree with the district court that the Dentons' claims under § 504

**14.** The Board also argues that federal preemption may require the application of the federal standard of review to all claims regarding the proper placement of a handicapped child. *See Town of Burlington v. Massachusetts Dep't of Educ. (Burlington I)*, 655 F.2d 428, 431 (1st Cir. 1981). The *Burlington* court found that the state law substantial evidence review standard

did conflict with the federal standard. Our resolution of this question based on the federal and North Carolina statutes, eliminates any need to resolve the preemption argument, or the argument that under *Erie* principles, as refined in *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), federal procedural law should apply irrespective of the state statute.

of the Rehabilitation Act of 1973 and under 42 U.S.C. § 1983 are without merit. Section 504 provides, in pertinent part,

No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794. The Supreme Court has emphasized that the purpose of the Rehabilitation Act is to prevent discrimination against the handicapped; it is not intended to impose an affirmative obligation on all recipients of federal funds. *See Smith v. Robinson*, 468 U.S. 992, 1016, 104 S.Ct. 3457, 3470, 82 L.Ed.2d 746 (1984); *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). The Board did not discriminate against Chris in its provision of educational services. *See also St. Louis Dev. Disabilities Treatment Center Parents Ass'n v. Mallory*, 591 F.Supp. 1416, 1471 (W.D.Mo.1984) (when § 504 claim concerns subject covered by EHA, compliance with EHA satisfies requirements of § 504), *aff'd*, 767 F.2d 518 (8th Cir.1985); 34 C.F.R. § 104.33(b)(2) (implementation of IEP meeting requirements of EHA satisfies Rehabilitation Act regulations). Because we have rejected the Dentons' claims under the EHA and the Rehabilitation Act, and because we perceive no other substantive basis for relief,[15] the Dentons' claim under § 1983 also fails.

## IV

We therefore conclude that the district court did not err in holding that the Board's plan, as modified by the local hearing officer, provided Chris Denton with the "free appropriate public education" mandated by federal and state law. The court gave due weight to the findings and conclusions of the local hearing officer and the state review officer, considered the additional evidence before it, and granted appropriate relief under the EHA. The judgment of the district court is affirmed.

AFFIRMED.

---

**15.** The Dentons make one oblique reference in their brief to the equal protection clause of the fourteenth amendment. We find no basis in the record for an equal protection claim.