[No. 35353-9-II. Division Two. September 5, 2007.]

*In the Matter of* A.D.

SUMNER SCHOOL DISTRICT NO. 320, *Appellant*, v. L.D., *as Parent and Legal Guardian, Respondent.*

---

[25] *Id.* at 7 (emphasis added).

[26] RCW 18.71.002.

*Lawrence B. Ransom* and *Christine E. Gardiner* (of *Karr Tuttle Campbell*), for appellant.

*Randal B. Brown* (of *Randal Brown Law Office*), for respondent.

¶1 BRIDGEWATER, J. — Sumner School District (Sumner) appeals a Pierce County Superior Court order affirming an administrative law judge's (ALJ) order, in which the ALJ ordered Sumner to provide A.D., a minor special education student, with instruction or counseling. A.D., through his mother and guardian, L.D., had requested an administrative due process hearing under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491, when, after at least two individualized education program (IEP) meetings, Sumner refused to offer extended school year (ESY) services to A.D.

¶2 We hold that Sumner failed to comply with the procedures set forth in the IDEA, thereby depriving A.D. of

a free appropriate public education (FAPE). Specifically, Sumner failed in its duty to identify what additional data it needed to determine whether A.D. needed special education and related services. Because A.D. had a history of ESY services and because teachers from New Horizon School (New Horizon), the private school in which Sumner agreed to place A.D., recommended that A.D. needed ESY services, Sumner could not rely on a lack of data in determining whether A.D. needed special education and related services, including ESY. Sumner's failure deprived A.D.'s parents of the opportunity to participate in the IEP formation process. Finally, we hold that substantial evidence supports the ALJ's determination that Sumner failed to provide A.D. with a FAPE. We affirm.

## FACTS

¶3 Before moving to Sumner in the summer of 2004, A.D., a 15-year-old special education student, resided in the Ramona Unified School District in California (Ramona). Since kindergarten, Ramona had provided A.D. with special education services. And since second grade, Ramona had provided A.D. with ESY services, "an extension of the school year to continue with the academic studies or behavioral intervention so [students] don't have regression." Administrative Record (AR) at 724.

¶4 In the summer of 2004, L.D., the mother and legal guardian of A.D., enrolled A.D. in Sumner for the 2004-05 school year. Thereafter, Sumner requested copies of A.D.'s educational records from Ramona. Ramona complied with Sumner's request. But, for some unexplained reason, Sumner never obtained any records of A.D.'s ESY course work, attendance, goals, or objectives.

¶5 Sumner and L.D. initially disagreed about A.D's placement and program for the 2004-05 school year. Eventually, however, they agreed to place A.D. in general education classes. Roger Smith, the Sumner assistant director for special services, said, "[I]f he is successful for a month

then we can go ahead and take a look at that as a placement." AR at 829. But after a disciplinary incident early in the school year, L.D. removed A.D. from Sumner.

¶6 L.D. then filed an administrative due process hearing request under the IDEA. But before any administrative hearing, Sumner, L.D., and A.D. settled their dispute in December 2004. Among other things, the settlement agreement provided:

1. *Educational Placement for the Remainder of the 2004-2005 School Year.* [Sumner] agrees to pay the cost of tuition for [A.D.] to attend New Horizon School . . . for the remainder of the 2004-2005 school year. . . .

. . . .

4. *Reevaluation.* The parties agree that [Sumner] will undertake a comprehensive reevaluation of [A.D.] during the remainder of the 2004-2005 school year . . . .

5. *Appropriate Program for 2005-2006 School Year.* Following the completion of the reevaluation described in Paragraph 4 above, the parties agree that the reevaluation team will meet to discuss the reevaluation results and to make educational programming recommendations for [A.D.]. The parties further agree that [Sumner] will arrange for an appropriately comprised IEP[1] team meeting, including the Parents, to draft an IEP detailing an individualized educational program for [A.D.] for the 2005-2006 school year. If the Parents disagree with the IEP team's recommended IEP and educational placement decision, the Parents maintain the right to file an administrative due process hearing request to challenge the proposed placement . . . .

---

[1] An IEP is an individualized education program or a "written program developed by a multidisciplinary team that must include the child's parents or guardians, teachers, and special education professionals." *N. Kitsap Sch. Dist. v. K.W.*, 130 Wn. App. 347, 358, 123 P.3d 469 (2005) (citing 20 U.S.C. § 1414(d)), *review denied*, 157 Wn.2d 1018 (2006).

AR at 244-46.[2] Under this settlement agreement, A.D. attended New Horizon from approximately January 2005 through the end of the 2004-05 school year.[3]

¶7 In February and March 2005, one of Sumner's school psychologists, Cher Collins, conducted the reevaluation required by the settlement agreement. Among other things, at the end of her reevaluation, Collins concluded that A.D.: (1) met the criteria for being emotionally disturbed; (2) had difficulty with hyperactivity, impulsiveness, and a lack of focus, all of which hindered him in the classroom; and (3) met the criteria for being learning disabled. With regard to the need for ESY services, though, Collins noted, "There is no current data indicating a need for ESY services at this time." AR at 279.

¶8 In April 2005, Sumner held an IEP meeting and then recommended an IEP. But after L.D. and other individuals from New Horizon expressed their opinion that A.D. would benefit from ESY services, Sumner amended the IEP. Within the amended IEP, Sumner wrote that the need for ESY services was "[t]o be defined in June, 2005. Sumner School District is prepared to offer the extended school year services. To be determined in June, 2005 based on progress from Jan[uary] thru June, 10, 2005, at New Horizons [sic]." AR at 330. L.D. then signed the IEP but noted in her own writing, "Do not agree with Sumner placement. Do agree with some of IEP." AR at 324.

¶9 At this time, Sumner also amended its March reevaluation. With regard to the need for ESY services, Collins now noted, "This will be looked at further during an IEP meeting." AR at 516. Again, L.D. signed this amended reevaluation, but she noted in her own writing, "[T]his is attendance sheet only not an agreement of amended IEP." AR at 524.

---

[2] Sumner did not provide any direct educational services to A.D.

[3] L.D. argues that Sumner "adopted" and "accepted" the Ramona IEP for the 2004-05 school year. Br. of Resp't at 31. But as Sumner notes, "[T]his issue refers to the fall of 2004 and was completely resolved by the settlement agreement entered into in December 2004." Reply Br. of Appellant at 22.

¶10 In June 2005, Sumner held an IEP meeting to determine whether A.D. would benefit from ESY services. The individuals from New Horizon noted that A.D. was making good progress in improving his academic skills; yet these same individuals also expressed their belief that A.D. needed ESY services for behavioral reasons. The individuals from Sumner, however, consistently focused on whether A.D. needed ESY services for academic reasons. And because New Horizon did not present any academic data to show that A.D. would benefit from ESY services, Sumner ultimately refused to offer ESY services to A.D.

¶11 Thereafter, L.D. filed an administrative due process hearing request under the IDEA.[4] After prehearing conferences, the ALJ heard testimony throughout November and December 2005 and January 2006. Among other things, in its order, the ALJ concluded:

9. It is noted the new statutory language adopted in IDEA '04 by Congress requires school districts to identify what additional data, if any, are needed to determine whether the child needs special education and related services. 20 USC § 1414(c). The local educational agency (school district) is required to administer such assessments and other evaluation measures as may be needed to produce the data identified by the IEP team under 20 USC § 1414(c)(1)(B). [Sumner] has maintained throughout its dealings with the Parents that it did not have sufficient data to make the ESY determination. It was aware of the dearth of data.

. . . .

11. There is no support for the position that a school district may delegate to a third party, such as a private school, the obligation to obtain data necessary for determination of a student's eligibility for special education services, including specially designed instruction in the form of ESY services. The data presented to [Sumner] by [New Horizon] included unanimity of opinion that [A.D.] needed ESY. He had a many-year history of receipt of ESY. It was not appropriate for [Sumner] to

[4] Before the ALJ, the parties did not dispute that the 2004 version of the IDEA applied to this matter.

wait for the 'missing' data to be delivered, then deny services based upon the lack of data. [Sumner] was obligated to assemble the data, especially in the circumstances presented by [A.D.].

. . . .

14. This procedural error interfered with the Parents' opportunity to participate in the IEP formulation process.

Clerk's Papers (CP) at 21-22.[5] The ALJ then ordered Sumner to provide A.D. with "the number of hours of instruction or counseling he would have received if he had participated in a 2005 ESY program at New Horizon. . . . This is to be delivered during mid-winter break, Spring break, Summer break, or Winter break from February 2005 through August 2007." CP at 23.

¶12 Sumner appealed to the Pierce County Superior Court, which affirmed the ALJ's order in its entirety and denied Sumner's petition for judicial review. Sumner now appeals the trial court's order.

## ANALYSIS

### I. INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA)

■ ¶13 Our Supreme Court has summarized the IDEA's purpose as follows:

The IDEA was enacted to address the special educational needs of disabled children. The act's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs. . . ." 20 U.S.C. § 1400(d)(1)(A). One goal of the IDEA is to provide comparable education to disabled students as that provided to nondisabled students. States that comply with the IDEA are entitled to federal funding to assist in the provision of a free appropriate public education to disabled children residing within the state. 20 U.S.C. § 1412.

___

[5] The ALJ stated that whether A.D. was a Sumner student for the 2004-05 school year was not an issue. In any case, the parties agreed that Sumner was responsible for A.D. during the summer of 2005.

*Tunstall v. Bergeson*, 141 Wn.2d 201, 228, 5 P.3d 691 (2000), *cert. denied*, 532 U.S. 920 (2001); *see also N. Kitsap Sch. Dist. v. K.W.*, 130 Wn. App. 347, 358, 123 P.3d 469 (2005), *review denied*, 157 Wn.2d 1018 (2006).

■ ¶14 A FAPE under the IDEA must be "in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9)(D). The IEP team establishes annual and short-term special education goals and the location of appropriate services. *K.W.*, 130 Wn. App. at 358 (citing 20 U.S.C. § 1414(d)). And under the IDEA, the IEP team must review the disabled student's special education program at least annually. *K.W.*, 130 Wn. App. at 358-59 (citing 20 U.S.C. § 1414(d)).

■ ■ ¶15 The school district has the ultimate duty to provide a special education student a FAPE under the IDEA. *K.W.*, 130 Wn. App. at 359; *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982); *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir.), *cert. denied*, 513 U.S. 965 (1994); *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1486 (9th Cir. 1992) ("[The IDEA] places the responsibility for the IEP process in the hands of the state and local education agencies."). And under the IDEA, a detailed system of procedural protections ensures that a disabled student is not denied a FAPE. *K.W.*, 130 Wn. App. at 359. The disabled student's parent or guardian can request that the appropriate State educational agency conduct an "impartial due process hearing" in order for the parent or the guardian to challenge "any matter relating to" the school's evaluation of the student's IEP or FAPE entitlement. 20 U.S.C. § 1415(f)(1)(A), (b)(6)(A); *K.W.*, 130 Wn. App. at 359. "Any party aggrieved by the findings and decision" of this due process hearing can bring a civil action "in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A).

■ ¶16 Finally, the party seeking relief in an administrative hearing challenging an IEP bears the burden of proof. *Schaffer v. Weast*, 546 U.S. 49, 56-58, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005). Similarly, the party challenging an agency's decision in a trial court bears the burden of proof. *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996) Here, because Sumner challenged the ALJ's decision, Sumner had the burden of proof on all issues.

## II. STANDARD OF REVIEW

■ ¶17 We review the ALJ's factual findings for clear error.[6] *K.W.*, 130 Wn. App. at 359-61. We review de novo whether the school district's FAPE plan is appropriate, but we give deference to the ALJ's findings of fact and we do not make educational policy determinations. *K.W.*, 130 Wn. App. at 360-61. Finally, we give heightened deference to the ALJ's decision because the ALJ's findings of fact were thorough and careful, as evidenced by the 12 pages of findings of fact. *See K.W.*, 130 Wn. App. at 360-61.

## III. SUMNER's FAPE FOR A.D.

¶18 Sumner argues that we should reverse the trial court's decision and the ALJ's decision. Essentially, Sumner argues that (1) the ALJ's findings of fact were contrary to or unsupported by the record and (2) the ALJ erred in concluding that Sumner committed a procedural error that denied A.D. a FAPE. We disagree.

### A. APPROPRIATE FAPE UNDER THE IDEA

■ ¶19 We employ a two-part test when reviewing whether a school district has provided a disabled student with an appropriate FAPE under the IDEA. *K.W.*, 130 Wn. App. at 362. " 'First, has the State complied with the

---

[6] Here, the trial court did not enter any findings of fact but simply affirmed the ALJ's findings of fact.

procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?' " *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2004) (quoting *Rowley*, 458 U.S. at 206-07).

¶20  The school district must satisfy both inquiries. *K.W.*, 130 Wn. App. at 362. Thus, if the school district fails the first procedural requirement, we may cease our analysis and determine that the school district violated the IDEA. *K.W.*, 130 Wn. App. at 362 (citing *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)). "And as previously discussed, the school district bears the ultimate responsibility of satisfying the disabled student's special education needs." *K.W.*, 130 Wn. App. at 362.

¶21  The procedural requirements are rigorous. *K.W.*, 130 Wn. App. at 362 (citing *M.L.*, 394 F.3d at 646). And given the importance of the IDEA's procedural safeguards,

> it should be of no surprise that when a school district or other state agency violates "the procedural requirements of the Act by failing to develop an IEP in the manner specified, the purposes of the Act are not served, and the district may have failed to provide a FAPE."

*Amanda J.*, 267 F.3d at 892 (quoting *W.G.*, 960 F.2d at 1485). Procedural flaws do not automatically require a finding that a school district has failed to provide a FAPE. *W.G.*, 960 F.2d at 1484. "However, procedural inadequacies that result in the loss of educational opportunity . . . or seriously infringe the parents' opportunity to participate in the IEP formulation process . . . clearly result in the denial of a FAPE." *W.G.*, 960 F.2d at 1484 (citing *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990), *cert. denied*, 499 U.S. 912 (1991); *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990); *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985).

## B. ESY Services

¶22 "[ESY] programming is educational programming which extends instruction beyond the conventional school year to prevent serious regression over the summer months." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1301 (9th Cir. 1992) (citing *Johnson v. Indep. Sch. Dist. No. 4*, 921 F.2d 1022, 1027-28 (10th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991)). Neither federal nor state law requires that every disabled student receive ESY services as part of his IEP. *Reusch v. Fountain*, 872 F. Supp. 1421, 1427 (D. Md. 1994). But these laws do require that school districts make ESY services available in those cases in which a disabled student needs ESY services in order to receive a FAPE. *Reusch*, 872 F. Supp. at 1427. Indeed, WAC 392-172-163(1) provides that "[e]ach public agency shall ensure that [ESY] services are available as necessary to provide FAPE." And WAC 392-172-163(2) specifically provides that "[ESY] services must be provided only if a student's IEP team determines, on an individual basis, in accordance with this chapter that the services are necessary for the provision of FAPE to the student."

¶23 As the Fifth Circuit Court of Appeals has explained, "The issue is whether the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an educational program during the summer months." *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir. 1986). "The amount of regression suffered by a child during the summer months, considered together with the amount of time required to recoup those lost skills when school resumes in the fall, is an important consideration in assessing an individual child's need for [ESY services] in the summer months." *Johnson*, 921 F.2d at 1027.

¶24 But the regression-recoupment analysis is not the only measure used to determine the necessity of ESY services. *See Johnson*, 921 F.2d at 1027-28. The Supreme

Court has explicitly held that administrative and court review may not limit analysis of the appropriateness of the IEP to any single criterion. *Rowley*, 458 U.S. at 202; *see also Yaris v. Special Sch. Dist.*, 558 F. Supp. 545, 558 (E.D. Mo. 1983), *aff'd*, 728 F.2d 1055 (1984). "We do not attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Rowley*, 458 U.S. at 202. According to the Tenth Circuit Court of Appeals, this restraint is as applicable to a specific educational program element, such as ESY services, as it is to a generalized issue under the IDEA. *Johnson*, 921 F.2d at 1028. Thus, the analysis of whether a disabled student needs ESY services in order to receive FAPE "is, of course, a general standard, but it must be applied to the individual . . . in the same way that juries apply other general legal standards such as negligence and reasonableness." *Alamo Heights*, 790 F.2d at 1158.[7]

¶25 Nevertheless, we are mindful of the Supreme Court's caution in *Rowley* that the "appropriate" education required by the IDEA is not one that is guaranteed to maximize the disabled student's potential. *Rowley*, 458 U.S. at 197 n.21; *Johnson*, 921 F.2d at 1028-29. Congress was mindful of the financial burdens that such expanded services imposed, and Congress was not utopian in its goals. *Johnson*, 921 F.2d at 1029.[8]

---

[7] The Tenth Circuit Court of Appeals has stated:

The analysis of whether the child's level of achievement would be jeopardized by a summer break in his or her structured educational programming should proceed by applying not only retrospective data, such as past regression and rate of recoupment, but also should include predictive data, based on the opinion of professionals in consultation with the child's parents as well as circumstantial considerations of the child's individual situation at home and in his or her neighborhood and community.

*Johnson*, 921 F.2d at 1028.

[8] Nevertheless, these financial burdens have offsetting financial benefits. As the Third Circuit Court of Appeals has stated:

A chief selling point of the Act was that although it is penny dear, it is pound wise—the expensive individualized assistance early in life, geared toward teaching basic life skills and self-sufficiency, eventually redounds to the benefit of the public fisc as these children grow to become productive citizens.

## C. Testimony Regarding A.D.'s IEP Meetings

■ ¶26 The essential and only issue before us is whether Sumner failed to comply with the procedures set forth by the IDEA, thus denying A.D. a FAPE. And giving due deference to the ALJ's findings of fact, we affirm.

¶27 At the April 2005 IEP meeting, Sumner asked New Horizon for data regarding A.D.'s academic regression-recoupment. According to Ruth Conrad, a learning specialist for Sumner, "We weren't asking the teachers to create new data. We just wanted them to submit the data that they had." AR at 595. But New Horizon balked at the request. Marla Veliz, the administrator and chief executive officer of New Horizon, recalled that "[Sumner] requested that the teacher collect data before spring break and after spring break. We expressed the concern that spring break was due to begin in just a few days and that it would be difficult to have that, predata."[9] AR at 784-85. Betsy Reid, the director of special services for Sumner, responded, "[W]e wanted her just to give us the data she had on his ongoing records that she would have kept over time, when she would be taking data on how he was doing in his reading and writing and charting that data." AR at 645. Ultimately, Sumner deferred its decision regarding whether A.D. needed ESY services until June 2005. As Conrad stated, "We asked for data, there wasn't any data. So we couldn't make a decision. So we deferred it until June." AR at 594.

¶28 At the June 2005 IEP meeting, Sumner again asked New Horizon for data regarding A.D's academic regression-recoupment. As Conrad noted:

> The purpose of that meeting was to see the data from [A.D.] that previous—from the school year of June—January to June,

*Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988), *cert. denied*, 488 U.S. 1030 (1989).

[9] Veliz stated that Sumner never asked New Horizon to produce any kind of discipline records or teacher notes.

see what data had been collected and decide if he had regressed and had [recoupment] and to see if he had regressed enough to see if we needed to have him have extended school year.

AR at 581. Elena Tsaregorodtseva, a teacher for New Horizon, explained, "So I got the impression they wanted to know at that point what were the current goals and what was the progress on those goals that [A.D.] had made." AR at 692. According to Conrad, Tsaregorodtseva then noted that "[A.D.] was progressing really well." AR at 582. And according to Joanne Streeck, an occupational therapist for Sumner, Tsaregorodtseva noted that A.D. was making "[e]xcellent progress." AR at 612. Finally, Reid stated, "We heard about [A.D.'s] progress in his leather crafts, we heard about his progress in reading, his progress in writing." AR at 652.

¶29 Yet New Horizon claimed that the April 2005 IEP meeting had focused on more than just A.D.'s academic issues and concerns. Veliz stated:

> And I brought up the concerns, I believe, that—the teachers did as well—about his behavior, his social behavior, and how difficult it was for him to reintegrate into the group and get back into the routine and structure of the school. And that then resulted—when he had been away from school for a few days, it resulted in more behavior problems.
>
> So the discussions that I can remember, and it was very brief, but it was about his academics and his behavior and his social skills.

AR at 678.[10] Tsaregorodtseva also noticed A.D.'s behavior problems, explaining:

> Well, he seems to be, you know, more aggressive in the way that he expresses himself. . . . And I have noticed he acts this way—he is very frustrated and usually the frustration comes from academics that he is struggling with. . . .
>
> . . . So it seemed like he was showing a lot of behavioral issues. He was struggling with his peer relationships. He was struggling with expressing himself and [his] ideas to teachers. He didn't have much patience. . . .

AR at 686.

---

[10] Veliz did not attend or participate in the June 2005 IEP meeting.

¶30 Nevertheless, Sumner again deferred its decision regarding whether A.D. needed ESY services for the summer of 2005. Conrad explained, "At the end of that meeting we decided that we couldn't make a decision because we didn't have any data. And so we asked [Tsaregorodtseva] to send us some more data from her grade book so we could see if there had been any regression." AR at 582. Streeck explained, "[W]e still did not have enough data showing regression and problems with recoupment." AR at 611.

¶31 Eventually, Tsaregorodtseva and New Horizon provided Sumner with more data regarding A.D's grades. But even then, Reid concluded, "[These grades] affirmed the decision to not offer extended school year services as they demonstrate[d] that [A.D.] made progress in most of his classes. There was only one that he dipped a bit but it was not substantial." AR at 659. Thereafter, Sumner refused to offer ESY services to A.D., stating:

> No evidence of regression/recoupment. New Horizons [sic] sent information on 6/29/2005 that was also considered. We remain firm on our decision to refuse the request for ESY services. The additional information presented does not show regression.
>
> . . . .
>
> Decision was reevaluated in light of additional information submitted the day following the IEP meeting.
>
> . . . .
>
> The additional information did not show a pattern of regression and lack of recoupment.

AR at 348.

¶32 Although Sumner ultimately refused to offer ESY services to A.D., it is far from certain that Sumner fully reviewed the existing evaluation data[11] on A.D. For instance, Collins noted that at the time of her March evalu-

---

[11] Existing evaluation data on the child includes: (1) "evaluations and information provided by the parents of the child"; (2) "current classroom-based, local, or State assessments, and classroom-based observations"; and (3) "observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A)(i)-(iii).

ation, she spoke to no one from Ramona about A.D.'s past ESY services. She admitted that she did not conduct any tests, evaluations, or assessments of A.D's need for ESY services. And she admitted that she was unfamiliar with any ESY assessments, tests, or evaluations. Furthermore, she never discussed with either Sumner or New Horizon what type of data needed to be collected or gathered for the IEP meetings.

¶33 Conrad did not think that A.D.'s past ESY services should have any bearing on his eligibility for future ESY services. She also believed that Sumner had no responsibility to gather and collect the data. In this regard, she stated, "The teacher that works with the student should be gathering the data." AR at 589. And, although Conrad explained that as a member of the IEP team she would consider A.D.'s school work product in determining his eligibility for ESY services, she admitted that she never looked at his work product. In essence, she blamed New Horizon because "[n]o data was given." AR at 593.

¶34 Reid also did not think that A.D.'s past ESY services should have any bearing on his eligibility for future ESY services. She said, "We gave very little weight to the California record because we did not know the criteria and it is an individual case-by-case basis. Every year ESY is considered part of the IEP." AR at 640. Streeck similarly did not think that A.D.'s past ESY services should have any bearing on his eligibility for future ESY services. She explained, "What's relevant for me is what [A.D.] is currently doing." AR at 616.

¶35 Finally, Kathy Hart, an intervention specialist for Sumner, wrote down a list of relevant factors that a consulting psychotherapist identified during the June 2005 IEP meeting. She explained, "This was—[he] came in and gave us a real confusing list of things that could be affecting [A.D.] and I just wrote down the highlights of different things that he said." AR at 908. In response to a question from the ALJ about whether these factors were specific to A.D., Hart replied, "Well, I found it very confusing, too. I did

not know if he was even talking all about [A.D.] or if he was just giving lists of things that might affect a student." AR at 910. In any case, Sumner never received any clarification.

¶36 On the basis of these incomplete and conflicting evaluations, assessments, and observations during the IEP meetings, Sumner had the ultimate duty to "identify what additional data" was needed to conclusively determine whether A.D. needed special education and related services. 20 U.S.C. § 1414(c)(1)(B). And giving due deference to the ALJ's thorough and careful findings of fact, we agree with the ALJ that:

> There is no support for the position that a school district may delegate to a third party, such as a private school, the obligation to obtain data necessary for determination of a student's eligibility for special education services, including specially designed instruction in the form of ESY services. The data presented to [Sumner] by [A.D.'s] then-current teachers and school staff included unanimity of opinion that [A.D.] needed ESY. He had a many-year history of receipt of ESY. It was not appropriate for [Sumner] to wait for the "missing" data to be delivered, then deny services based upon the lack of data. [Sumner] was obligated to assemble the data, especially in the circumstances presented by [A.D.].

CP at 22. Because Sumner did not "identify what additional data" was needed under 20 U.S.C. § 1414(c)(1)(B) to determine whether A.D. needed special education and related services, it did not comply with the procedures set forth in the IDEA.

¶37 And although Sumner argues that its procedural flaws were not severe enough to deprive A.D.'s parents of an opportunity to participate in the IEP formulation process, Br. of Appellant 48-50, we disagree. "An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed." *Amanda J.*, 267 F.3d at 892. Here, New Horizon was most familiar with A.D.'s social and emotional needs. In fact, as early as April 2005, New Horizon informed Sumner about A.D.'s behavioral

problems.[12] Yet, as late as June 2005, Sumner continued to develop A.D.'s IEP without fully taking into consideration the recommendations of the New Horizon teachers, those individuals who were the most knowledgeable about A.D. Then, based on incomplete and conflicting evaluations, assessments, and observations, Sumner refused to offer ESY services to A.D.

¶38 Clearly, Sumner's actions did not allow for full, let alone adequate, parental involvement with all parties. *See Rowley*, 458 U.S. at 205-06. Thus, we conclude that Sumner's procedural inadequacy adversely affected A.D.'s parents' opportunity to participate in the IEP formation process.[13] Because Sumner failed the procedural requirement under the IDEA, we cease our analysis, and we do not examine the substantive requirement. *K.W.*, 130 Wn. App. at 362.

¶39 Moreover, Sumner's arguments that New Horizon or A.D.'s parents were somehow to blame are without merit. First, the IDEA places the responsibility for the IEP process in the hands of the state and local education agencies. *See W.G.*, 960 F.2d at 1486. Thus, the responsibility for preparing A.D.'s IEP lay primarily with Sumner. *See W.G.*, 960 F.2d at 1485. It was Sumner's duty to conduct meaningful meetings with the appropriate parties, including A.D.'s parents and New Horizon, its contract provider. *W.G.*, 960

---

[12] At the April 2005 IEP meeting, New Horizon informed Sumner that A.D. was "working on academic *as well as* social behavioral skills." AR at 342 (emphasis added). And New Horizon informed Sumner that A.D. needed "to increase *both* academic and social behavioral skills in order to transition successfully." AR at 342 (emphasis added).

[13] Sumner asserts that A.D.'s performance before and after the 2005 summer break showed that he was not in need of ESY services. "This is simply not the record of a student who suffered serious regression over his summer vacation and failed to recoup his skills at a reasonable rate." Br. of Appellant at 30. Yet the ALJ, relying on *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999), concluded, "The appropriateness of an IEP is not determined in hindsight, by waiting until after the education has or has not been provided." CP at 22. We agree: " '[A]n IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted.' " *Adams*, 195 F.3d at 1149 (quoting *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3d Cir. 1993)).

F.2d at 1485. Sumner cannot excuse its actions simply by dismissing New Horizon's data, recommendations, and opinions, evidence that we, the trial court, and the ALJ found sufficient for the parents to rely on in challenging A.D.'s IEP. If Sumner disagreed with the recommendations and opinions of those who were most familiar with A.D.'s social and emotional needs, it was Sumner's duty to arrange for more testing and data.

¶40 Second, as the party challenging the ALJ's ruling on appeal, Sumner had the burden of proof. *See B.S.*, 82 F.3d at 1498. Sumner cannot excuse its actions simply by attempting to shift the burden of proof to A.D.'s parents. After all, by relying on New Horizon's data, recommendations, and opinions, A.D.'s parents already sustained their burden of proof at the administrative hearing challenging A.D.'s IEP. *See Schaffer*, 546 U.S. at 56-58.

¶41 In conclusion, Sumner has not sustained its burden of proof on appeal. Sumner has not shown that the ALJ's findings of fact were contrary to or unsupported by the record. And Sumner has not shown how the ALJ erred when it concluded that Sumner did not comply with the procedures set forth in the IDEA. Because we have no basis for upsetting the ALJ's ruling, we conclude that the record is sufficient to support the ALJ's determination that Sumner failed to provide A.D. with a FAPE.

¶42 Affirmed.

VAN DEREN A.C.J., and HUNT, J., concur.